Laura Denvir Stith, Judge
Defendant Jeffrey L. Bruner appeals his convictions on charges of first-degree murder and armed criminal action, alleging the circuit court erred by refusing to submit a self-defense instruction. This Court recently reaffirmed in State v. Smith, 456 S.W.3d 849, 852 (Mo. banc 2015), that if substantial evidence is presented of the elements of self-defense, then the issue is injected and self-defense must be submitted by instructing the jury that the State has the burden of proving a lack of self-defense beyond a reasonable doubt. Here, the circuit court determined Mr. Bruner failed to inject the issue of self-defense because self-defense was not supported by the evidence. While the burden of producing evidence sufficient to inject self-defense is a minimal burden, this Court agrees it was not met here. For that reason, the circuit court did not err in refusing the self-defense instruction. The judgment is affirmed.
I. PROCEDURAL AND FACTUAL BACKGROUND
Considering the evidence in the light most favorable to submission of a self-defense instruction, the record shows Mr. Bruner and his wife, Michelle Hale, were estranged. Mr. Bruner testified that to his knowledge she was not seeing anyone else, though he was aware she had met a college football coach for a lunch date. He later learned the coach was Derek Moore.
Mr. Bruner was convinced he and his wife would reconcile. They had been married more than 20 years, and she had several extramarital affairs, once filing for divorce. Following each affair, the couple reconciled and Ms. Hale pledged her fidelity to Mr. Bruner.
Although Ms. Hale moved out of their marital home two weeks earlier, Mr. Bruner sometimes visited her at her apartment, even spending the night and having sexual relations with her on occasion. The day before the shooting, Mr. Bruner met with his wife and asked if she would go out to *531 dinner with him the next night. She declined, saying she would have to work late.
On the day of the shooting, Mr. Bruner picked up his 14-year-old daughter after she and a friend watched a movie at a local movie theater. Mr. Bruner and his daughter went to eat at a nearby McDonald's. While there, the daughter saw a Facebook posting of her mother (Ms. Hale) with another man (Mr. Moore), apparently standing in front of the movie theater, captioned "Date Night." The daughter showed her father the picture, and the image upset him.
Mr. Bruner testified he decided to go directly to the movie theater to talk with his wife to fix his marriage and to save her from "divine punishment;" he believed "what she was doing wasn't right" and "that God is going to punish her for what she's done." While Mr. Bruner and his daughter were on the way to the movie theater, he sent Ms. Hale two texts. One said merely, "WTF," and the other, "where are you at." Mr. Bruner received no response. The daughter told her father she wanted to go home because she did not want to see her mom and dad fighting. Mr. Bruner responded jokingly, "It's not like I'm going to kill a man." He also jokingly said, "I wouldn't put it past [your mother, a police officer,] to try to put me in jail."
Nonetheless, Mr. Bruner turned around and drove his daughter home. While there, he asked his daughter to display the Facebook post on the larger home computer screen, in part so he could ascertain whether the picture was taken at the same movie theater at which he just had picked up his daughter. He also grabbed two loaded guns (one gun belonged to Ms. Hale, which she carried while jogging) and an extra clip because he knew the man in the picture was very big and, "if he tried to beat me up or something, that I would be able to back him off with it." Mr. Moore was around 6'4' or 6'5', and Mr. Bruner was 5'10' and weighed about 175 pounds.
Mr. Bruner drove to the movie theater but could not find Ms. Hale's vehicle in the parking lot. He then parked in the lot near the movie theater's only exit. While waiting for the couple to exit the movie theater, he texted back and forth with his daughter. He asked her whether there were any other Facebook posts and confirmed his wife was wearing a black dress. The record also shows Mr. Bruner attempted to call his wife, but the call went unanswered and was logged as a "missed call."
Mr. Bruner saw Ms. Hale and Mr. Moore about to exit the movie theater. He left his car and approached the couple just after they exited the building as they were standing on the concrete sidewalk. Mr. Bruner stood slightly below the curb in the asphalt driveway, facing the movie theater, and addressed comments to his wife. Mr. Moore moved in front of Ms. Hale and approached Mr. Bruner. Mr. Bruner stepped backward and made clear he was not interested in speaking to Mr. Moore. Mr. Moore stepped toward Mr. Bruner repeatedly, and each time, Mr. Bruner stepped backward. At some point, Ms. Hale interposed herself and placed a hand on Mr. Moore's chest as if to restrain him. As the three approached the concrete median (another concrete sidewalk a step higher than the asphalt driveway separating the driveway from the parking lot), Mr. Bruner stopped backing up to avoid tripping on the median.
Ms. Hale and Mr. Moore then walked past Mr. Bruner, who pivoted to remain facing them. Mr. Moore was up on the median while Mr. Bruner remained down on the asphalt driveway. Mr. Bruner testified Mr. Moore was in a "fighting stance," which he described as not facing him square on, but standing "sideways looking *532 at [him]," with one shoulder closer to him than the other. Mr. Moore did not move toward Mr. Bruner, nor attempt to hit him, but he did say, "I'm not from around here, motherf* *ker, I'll have your throat slit in two hours." Mr. Bruner responded to Mr. Moore, "Why are you threatening me?" Mr. Moore replied, "I don't play these redneck games," and then said, "You don't know who the f* *k you are messing with."
Mr. Bruner did not testify that he then killed Mr. Moore in self-defense or that he did so because he feared for his life. Rather, his defense was that he did not act out of his own volition. Mr. Bruner testified that, immediately after Mr. Moore's last statement, the stress caused him to go into a dissociative mental state he described as feeling almost like passing out. He says he experienced something like tunnel vision, darkness, and seeing and hearing everything as if from a distance. It felt as if everything was "closing in on [him]." Mr. Bruner said he then took out the gun and shot Mr. Moore multiple times.
Mr. Bruner testified, that due to his dissociative state, he did not so much choose to fire the gun; rather, it was as if he was not acting with volition: "I remember seeing the gun come out and I remember seeing one or two shots and I remember hearing three." On cross-examination, he mentioned for the first time that he had seen Mr. Moore's arm move just before the shooting, and he perceived Mr. Moore "was trying to grab [him]," although he says what he saw was blurry and indistinct due to his mental state, which he described as reducing his vision. Mr. Bruner described the shooting as something happening while he was in a surreal mental state: "It's like it wasn't even me. I don't know how to explain it. I think I said it was kind of like your [sic] falling asleep and all of a sudden you flinch." Mr. Bruner did not remember, but did not deny, shooting Mr. Moore an additional three times or kicking him in the head after he went down, which is what witnesses testified occurred. Mr. Bruner did not testify he saw or thought Mr. Moore had a weapon. Rather, when asked if he remembered a weapon on Mr. Moore, he replied, "No. I did not." He also never testified he was afraid Mr. Moore would cause him death or serious physical injury, or commit a forcible felony against him, or, indeed, that he feared Mr. Moore would punch him. He also said he did not consider leaving the scene, and testified, "I wished I had thought to leave."
Mr. Bruner testified his next lucid moment was sitting behind the wheel of his vehicle in the parking lot. He said he then saw individuals in the crowd coming toward him, left the gun in the car and went back out, told those coming toward him he was unarmed, removed his coat, dropped it to the ground to show he was unarmed, and lay there until the police came. He did not remember anything he said to anyone.
Mr. Bruner explained his conduct by presenting expert testimony that, at the time of the shooting, he suffered from acute stress disorder that caused him to experience dissociation and depersonalization in the face of trauma or life threatening situations, and this explained his confused memory of the shooting. The expert diagnosed Mr. Bruner with acute stress disorder, which he described as an early stage of post-traumatic stress disorder. Acute stress disorder is characterized by an abnormal reaction to a stressful situation, and the expert testified that one of the diagnostic criteria is exposure to a life-threatening situation. Here, the expert testified it was Ms. Hale's infidelity that caused stress for Mr. Bruner, which, if internalized, "can create a buildup that can ultimately result in an explosive reaction." On cross-examination, the expert said the diagnosis was not supported by any of the tests conducted but was based solely on *533 Mr. Bruner's own statements and the evidence and pleadings at trial, the latter of which he admitted are normally not considered by a clinician in making a diagnosis.
Mr. Bruner's daughter also testified. Supportive of her father, she said he was angered by the Facebook post she showed him. They drove directly home from McDonald's (not toward the theater first). Her father said he was taking her home because he did not want her to see him kill a man. Her father also told her he would be going to jail that night and, by the end of the night, she would have neither a mother nor a father.
A retired police chief and homicide investigator, who was at the movie theater attending a movie, testified that, while Mr. Bruner was lying on the ground, he said, "They posted it all over Facebook. What's a guy supposed to do?" Another movie patron testified that before the police arrived and while Mr. Bruner was lying on the ground, he said, "Yeah. I did it. Twenty-one years of marriage and this is what it comes down to."
The physical evidence and medical examiner's testimony showed the gun was fired seven times, and Mr. Moore was hit six times: once on the outside of the right shoulder, once on the thumb side of his left forearm, once on the front of the left forearm, and three times in the back. Wounds on the palm of one hand were consistent with at least one shot being fired while the palm was against the pavement. Multiple witnesses testified, after the first three shots were fired, they saw Mr. Moore go down, first to his knees, then to all fours, at which point Mr. Bruner stepped closer or leaned over Mr. Moore and fired the additional shots into him. Multiple witnesses also testified, after the gun was empty, Mr. Bruner kicked or stomped on Mr. Moore in the head and face or stomach.
In accordance with the defense's opening statement and closing argument, the defense took the position that the stress of his wife's repeated infidelities and blind-siding him with the revelation that she had been dating another man caused Mr. Bruner to suffer from acute stress disorder that led to the dissociative mental state and inability to control his impulses. The defense argued, therefore, Mr. Bruner did not act with deliberation or upon cool reflection and should be found not guilty of first-degree murder, defined in section 565.020[1] as "knowingly caus[ing] the death of another person after deliberation upon the matter." The defense focused on evidence tending to show Mr. Bruner did not form the intent to kill Mr. Moore at McDonald's, at home, while waiting in the theater parking lot, or when initiating the conversation with his wife.
The State argued at trial the only element of first-degree murder at issue was deliberation, defined as cool reflection on the matter for any length of time, and Mr. Bruner began such deliberation the moment he saw the Facebook posting. The State emphasized evidence tending to show Mr. Bruner had already decided to kill a man at that point. The court submitted a verdict director for first-degree murder with lesser-included offense instructions for second-degree murder and voluntary manslaughter, and armed criminal action associated with conviction for one of the homicide crimes. The circuit court also submitted an instruction based on MAI-CR 3d 308.03, allowing the jury to consider whether Mr. Bruner had a mental disease or defect in deciding whether he acted with the state of mind required for first-degree murder. The defense also sought a self-defense instruction. It was denied on the basis there was no evidence *534 from the defendant's testimony or from any of the other witnesses that the defendant had any reasonable belief he was defending himself from imminent serious physical injury or death. The jury found Mr. Bruner guilty of first-degree murder and armed criminal action. Mr. Bruner appealed. Following an opinion by the court of appeals, the case was transferred to this Court under Rule 83.04. Mo. Const. art. V, § 9 .
II. STANDARD OF REVIEW
The defendant claims error in failing to give a self-defense instruction. "This Court reviews de novo a trial court's decision whether to give a requested jury instruction." State v. Jackson, 433 S.W.3d 390, 395 (Mo. banc 2014) ; accord State v. Comstock, 492 S.W.3d 204, 205-06 (Mo. App. 2016). "The circuit court must submit a self-defense instruction 'when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony,' [ State v. Westfall, 75 S.W.3d 278, 281 (Mo. banc 2002) ], and failure to do so is reversible error." Smith, 456 S.W.3d at 852 (citation omitted). "In determining whether the circuit court erred in refusing to submit an instruction on self-defense, the evidence is viewed in the light most favorable to the defendant."[2] Id.
III. THE CIRCUIT COURT DID NOT ERR IN REFUSING TO SUBMIT SELF-DEFENSE BECAUSE INSUFFICIENT EVIDENCE WAS PRESENTED TO INJECT SELF-DEFENSE
At the time of trial, section 563.031.5 provided, "The defendant shall have the burden of injecting the issue of justification under this section" and "injecting the issue" was defined in section 556.051 as follows:
When the phrase "The defendant shall have the burden of injecting the issue " is used in the code, it means
(1) The issue referred to is not submitted to the trier of fact unless supported by evidence ; and
(2) If the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue.
(Emphasis in original and added).[3]
The statute, therefore, requires the defendant to bear the burden of showing *535 self-defense is "supported by evidence" to inject self-defense, at which point the burden shifts to the State to prove a lack of self-defense beyond a reasonable doubt.[4] Through the years, Missouri courts have used various terms to describe what quantum of evidence satisfies the burden of injecting self-defense. This Court summarized the history of these terms and clarified their meaning in Westfall :
The quantum of proof necessary to require the giving of a self-defense instruction has been variously defined as "substantial evidence," "evidence putting it in issue," "any theory of innocence ... however improbable that theory may seem, so long as the most favorable construction of the evidence supports it," "supported by evidence," "any theory of the case which his evidence tended to establish," "established defense," and "evidence to support the theory." (Citations Omitted); State v. McQueen , 431 S.W.2d 445, 448-49 (Mo. 1968).
75 S.W.3d at 280 n.7 ; accord, State v. Weems, 840 S.W.2d 222, 226 (Mo. banc 1992).
Since Westfall, this Court has settled on describing the quantum of proof required as "substantial evidence." See, e.g., Smith, 456 S.W.3d at 852 ; State v. Bolden, 371 S.W.3d 802, 805 (Mo. banc 2012) . In so doing, this Court has not suggested it intended to increase the burden of injecting the issue of self-defense beyond what otherwise has been required. Sufficient "substantial" evidence is provided if there is "evidence putting a matter in issue." Avery, 120 S.W.3d at 200.[5] "If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it." Westfall, 75 S.W.3d at 280 . Moreover, "[s]ubstantial evidence of self-defense requiring instruction may come from the defendant's testimony alone as long as the testimony contains some evidence tending to show that he acted in self-defense." Id.
*536 The elements of self-defense that must be shown by substantial evidence are set out in the self-defense statute, section 563.031, which at the time of trial provided in relevant part:
1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person, unless:
(1) The actor was the initial aggressor; ...
....
2. A person may not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
(1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony ;
....
3. A person does not have a duty to retreat from a dwelling, residence, or vehicle where the person is not unlawfully entering or unlawfully remaining. A person does not have a duty to retreat from private property that is owned or leased by such individual.[6]
This Court recently noted in Smith that under section 563.031, to inject self-defense, before any use of force can be justified, the defendant must "reasonably believe[ ] such force is necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful force by another." Smith, 456 S.W.3d at 852. Further, deadly force is justified only if the defendant "reasonably believes that such deadly force is necessary to protect himself, or herself ... against death, serious physical injury, or any forcible felony." § 563.031.2(1).
"Reasonably believe" means "a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false." MAI-CR 3d 306.06A[6]. "Deadly force" means "physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury." MAI-CR 3d 306.06A[5].
Smith, 456 S.W.3d at 852 . Section 563.031.1(1) also provides that force may not be used in self-defense if the defendant "was the initial aggressor."
Although the State recognizes section 563.031 governs the elements of self-defense, the State and the defendant nonetheless repeatedly quote from cases that set out a slightly different common law formulation of self-defense, and then argue back and forth as to whether this common law test is met here.[7] While the parties are *537 correct that these are the elements of self-defense under the common law, and while they largely, but not completely, parallel the elements of self-defense under the statute, it is the statute that necessarily must govern what is required to inject self-defense. Reliance on cases addressing what is required under a different test, therefore, is not helpful, and should no longer be followed.
This appeal turns on whether the three elements set out in section 563.031 were injected. Smith is instructive on this question. In Smith , this Court found the circuit court "did not err in its refusal to submit a self-defense instruction" because the evidence taken in the light most favorable to the defendant did "not establish that [defendant] reasonably believed the use of deadly force was necessary." 456 S.W.3d at 852 . The defendant in Smith argued there was substantial evidence to warrant a self-defense instruction because "he was 'not the initial aggressor[,] ... he tried to avoid further confrontation with [the victim] by backing away and declining to fight him, and when this was unsuccessful, he began to fear imminent serious physical injury or death.' " Id.
This Court held in Smith , that although the record showed the victim "threatened to fight, yelled at, and came within inches of [the defendant]" and the defendant at first "tried to avoid further confrontation ... by backing away and declining to fight," there was no evidence the defendant reasonably believed the use of deadly force was necessary because the victim "neither hit nor exhibited a weapon to [the defendant]." Id. The defendant " 'figured' that [the victim] was looking for a gun" when the victim ran away and stopped between two dumpsters, but "[n]o one, including [the defendant], saw a weapon on [the victim] during the incident." Id. Therefore, the defendant in Smith failed to meet his burden of injecting self-defense by proffering substantial evidence of the elements of self-defense under the statute. Id.
Similarly, in Dorsey , 113 S.W.3d at 317 , the court of appeals affirmed the circuit court's decision that the defendant was not entitled to a self-defense instruction as a matter of law. In that case, the defendant "introduced a ... deadly instrument into what had been[,] at most[,] a simple battery and significantly raised the level of violence." Id. There was no evidence the victim ever possessed or threatened the defendant with a weapon or that the defendant ever "considered himself at risk of serious physical injury or death." Id.
As in Dorsey , Mr. Bruner escalated what would at most have been a simple assault-an attempt by Mr. Moore to "grab" him-into a deadly confrontation. Mr. Moore used the same kind of language found insufficient in Smith, yelling and threatening to fight.[8] The evidence further showed Mr. Bruner and Mr. Moore came into close contact with one another, taking "fighting" poses, but the men never touched. Mr. Bruner said only that he saw some movement of Mr. Moore's right arm and thought perhaps Mr. Moore was going to "grab" him. On redirect, Mr. Bruner again said he did not see Mr. Moore step toward him or move his arm toward him, but just that he saw "some kind of arm motion" and "things were kind of closing *538 in, so what the motion was isn't real clear to me." No other evidence was offered that would support submitting self-defense. In fact, Mr. Bruner did not testify that he acted in self-defense. Although he testified and described his mental state before shooting Mr. Moore, Mr. Bruner never testified he thought Mr. Moore was going to hit him or that he was in fear of death, serious physical injury, or any forcible felony. None of the many eyewitnesses saw a weapon in Mr. Moore's possession or saw him try to attack Mr. Bruner, and the evidence was that Mr. Moore did not either hit or exhibit a weapon to Mr. Bruner.[9] Mr. Bruner testified he did not remember seeing a weapon on Mr. Moore.
Mr. Bruner has not met his burden of injecting self-defense in his case. See § 563.031.5 ; § 556.051. Mr. Bruner failed to inject sufficient evidence that he reasonably believed deadly force was necessary to protect himself from death, serious physical injury, or any forcible felony. § 563.031.2(1). The dissent asks this Court to supply missing evidence by speculating that Mr. Bruner thought Mr. Moore had a knife in his hand and was fearful Mr. Moore was going to slit his throat. Not only was there no testimony that Mr. Bruner feared Mr. Moore was going to slit his throat before he could escape, but Mr. Bruner affirmatively testified he did not think Mr. Moore had a weapon. This Court cannot "supply missing evidence" or grant Mr. Bruner the type of "unreasonable, speculative, or forced inferences" the dissent proposes. See Lammers , 479 S.W.3d at 632 .
What the Court must do, and has done, is view the evidence in the light most favorable to Mr. Bruner. Doing so, without granting him unreasonable, speculative, or forced inferences, the only relevant evidence on Mr. Bruner's objective and subjective state of mind is that Mr. Moore was swearing and threatening him and he believed Mr. Moore was about to make unwanted or offensive contact by grabbing him. Such evidence is not sufficient to justify deadly force. § 563.031.2(1). Words alone are insufficient to support a claim of self-defense. Avery, 120 S.W.3d at 206. Neither is deadly force justified in response to fear of being grabbed or even punched. State v. Wiley, 337 S.W.3d 41, 45 (Mo. App. 2011) . At best, Mr. Bruner showed a fear of a simple assault or battery, but "[d]eadly force cannot be used to repel a simple assault and battery." Dorsey, 113 S.W.3d at 316. Deadly force is only justifiable when the defendant reasonably believes that such deadly force is necessary to protect himself from death, serious physical injury, or any forcible felony.[10] § 563.031 ; accord, State v. Burks, 237 S.W.3d 225, 229 (Mo. App. 2007) (finding self-defense was not injected because "[a]t no time did [defendant] testify he was aware of certain and imminent serious bodily injury") (emphasis added).
Neither is Mr. Bruner's argument helped by his testimony that he suffered from acute stress disorder which rendered his conduct in shooting Mr. Moore unintentional and as if it occurred "in a dream." That defense is inconsistent with self-defense, which "constitutes an intentional *539 but justified killing, whereas accident connotes an unintentional killing. Self-defense and accident are therefore inconsistent." Avery, 120 S.W.3d at 201 . For this reason, an unintentional act, such as Mr. Bruner's description of the shooting "like it wasn't even me," is not consistent with self-defense. Of course, the fact Mr. Bruner testified he did not deliberately shoot at the victim would not preclude the submission of self-defense if other evidence had injected the defense. Id. But no other evidence was offered supportive of self-defense. Rather, the other evidence tends to show Mr. Bruner decided he was going to "kill a man" shortly after seeing the Facebook post, and he deliberately did so.
IV. CONCLUSION
Section 563.031 clearly provides that before a self-defense instruction is necessary, there must be evidence from which a reasonable inference could be drawn that the defendant acted on the reasonable belief deadly force was necessary to protect from death, serious physical injury, or a forcible felony. Because the record does not contain substantial evidence supporting self-defense, Mr. Bruner was not entitled to a self-defense instruction. The circuit court did not err in refusing to submit a self-defense instruction. The judgment is affirmed.
Draper, Russell, Powell and Breckenridge, JJ, concur;
Wilson, J ., dissents in separate opinion filed;
Fischer, C.J., concurs in opinion of Wilson, J.

All statutory references are to RSMo Supp. 2013, unless otherwise noted.

The dissent argues that, in viewing the evidence in the light most favorable to the defendant, this Court must both give the defendant all reasonable inferences and disregard all evidence contrary to giving the self-defense instruction. It cites to Westfall , which simply holds, "Moreover, an instruction on self-defense must be given when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony." 75 S.W.3d at 281 . That quote does not support the proposition that this Court must disregard all evidence contrary to the giving of the self-defense instruction but rather simply reflects what this Court held in State v. Avery, 120 S.W.3d 196, 201 (Mo. banc 2003) , that "self-defense is submissible, even where the defendant testifies that the killing was an accident, if the inconsistent evidence of self-defense is offered by the State or by defendant through the testimony of a third party." Contrary to the dissent's argument in favor of submitting a self-defense instruction, this does not either authorize or require the courts to supply speculative or missing inferences, nor does it transform mere words or threats or simple assaults into justification for using deadly force. See, e.g., State v. Lammers , 479 S.W.3d 624, 632 (Mo. banc 2016) ; Dorsey v. State , 113 S.W.3d 311, 317 (Mo. App. 2003) .

Under the revisions to the criminal code effective January 1, 2017, this provision was repealed and moved to section 556.061, RSMo Supp. 2016, which now comparably provides:
In this code, unless the context requires a different definition, the following terms shall mean:
....
(3) "Burden of injecting the issue":
(a) The issue referred to is not submitted to the trier of fact unless supported by evidence; and
(b) If the issue is submitted to the trier of fact any reasonable doubt on the issue requires a finding for the defendant on that issue....

This contrasts with the requirement for submitting a nested lesser-included offense. Jackson, 433 S.W.3d at 401 , held that no additional evidence must be introduced to be entitled to an instruction on a nested lesser-included offense because the evidence required to allow submission of the greater offense necessarily is sufficient to include a nested lesser-included offense, as the lesser-included offense has no elements not contained in the greater offense. By contrast, when the offense is not a nested lesser-included offense, then some evidence must support it. State v. Brown, 524 S.W.3d 44, 48 (Mo. banc 2017) ("[T]he determination of whether there is a basis in the evidence obligating the court to instruct [on a non-nested lesser-included offense] is based on the evidence in the case."); accord, State v. Payne, 488 S.W.3d 161, 164 (Mo. App. 2016) ("Because voluntary manslaughter is not a nested lesser included offense of either first- or second-degree murder, Jackson is distinguishable from this case and provides no support to [defendant].").

The dissent opts to create a new standard for injection of self-defense: "whether there is a basis in the evidence for a reasonable doubt regarding the issue on which the state bears the burden of proof, i.e., that self-defense was not present." Op. at 540. But the dissent fails to cite any authority for this standard, nor could it, for there is no such authority. This standard ignores the requirement of section 556.051(1) that self-defense must be "supported by the evidence." § 556.051(1). In other words, subsection (1) provides that only once the defendant has injected the issue through presenting evidence in support of self-defense does the State have the burden of proving beyond a reasonable doubt under subsection (2) that the defendant did not act in self-defense. § 556.051(1), (2).

The revised version of section 563.031, enacted after the events at issue here, differs only in the duty to retreat. § 563.031, RSMo Supp. 2016. The legislature has repeatedly modified the requirements of the duty to retreat, specifying an increasing list of places where the use of force in self-defense may be "necessary" even when safe retreat is available. See, e.g., § 563.031, RSMo 2000 (no language stating the actor has no duty to retreat); § 563.031.3, RSMo Supp. 2013 (there is no duty to retreat while lawfully on one's private property or in one's vehicle); § 563.031, RSMo Supp. 2016 (no duty to retreat from any location the person has a right to be).

The common law test requires proof of four elements: (1) the absence of aggression or provocation; (2) real or apparent necessity to use deadly force to save defendant from immediate danger; (3) a reasonable cause for belief that deadly force was necessary; and (4) an attempt to do all within defendant's power consistent with personal safety to avoid the danger. See, e.g., State v. Thomas, 161 S.W.3d 377, 379 (Mo. banc 2005) ; State v. Chambers, 671 S.W.2d 781, 783 (Mo. banc 1984).

Mr. Moore threatened Mr. Bruner, saying "I'm not from around here, motherf* *ker, I'll have your throat slit in two hours." Mr. Moore also yelled at Mr. Bruner: "I don't play these redneck games," and "You don't know who the f* *k you are messing with."

In fact, the only physical contact between them occurred after Mr. Moore was shot, as Mr. Bruner kicked Mr. Moore while he was lying on the ground. Mr. Bruner suffered no physical injury. See State v. Drisdel, 417 S.W.3d 773,784 (Mo. App. 2013) (acknowledging severity of victim's injury and lack of injury to defendant were factors to consider in determining no substantial evidence to support a self-defense instruction) (citation omitted).

Section 563.011(3) defines "[f]orcible felony" as "any felony involving the use or threat of physical force or violence against any individual, including but not limited to murder, robbery, burglary, arson, kidnapping, assault, and any forcible sexual offense."