

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED110406 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable John N. Borbonus |
| THOMAS CLEMENT, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 7, 2023 |

## Introduction

Thomas Clement ("Clement") appeals from the trial court's judgment following his jury convictions on one count each of murder in the first degree and armed criminal action. In his sole point on appeal, Clement contends the trial court erred in refusing to instruct the jury on the use of physical force in self-defense while in a dwelling, residence, or vehicle, otherwise known as the "Castle Doctrine." Clement posits that substantial evidence was introduced at trial to require the trial court give the instruction. When viewing the evidence in the light most favorable to the defendant and to giving the instruction, as we must, we hold the trial court erred in refusing to instruct the jury on the Castle Doctrine and thereby prejudiced Clement. Accordingly, we vacate the trial court's judgment and remand this matter for a new trial.

## Factual and Procedural History

This Court recites the following facts in the light most favorable to the defendant. State v. Straughter, 643 S.W.3d 317, 321 (Mo. banc 2022) (quoting State v. Bruner, 541 S.W.3d 529,

534 (Mo. banc 2018)). On July 7, 2019, Clement, his wife, and their four children were visiting his wife's cousin, Ashley Simpson ("Simpson"), at Simpson's apartment. Clement was returning a dog that his family looked after while Simpson was pregnant. Around midnight, Clement and his family were getting ready to leave the apartment when someone crashed against the front door. Simpson opened the door and found Larry Neal ("Neal") and Andrew Henley ("Henley") outside the apartment. Clement and Simpson did not recognize Neal or Henley.[1]

Clement pulled Simpson back into the apartment, drew his gun, and confronted Neal and Henley because he believed they were trying to break into the apartment. Neal threatened to "f*** [Clement] up" for pointing a gun at him. Clement explained that he thought someone was trying to break into the apartment. Neal and Henley denied that they were trying to break in. Neal remained upset with Clement.

Neal appeared drunk and belligerent, and Henley tried to calm him down. Because Neal was severely intoxicated, Henley had to push him up the stairs to the third floor. Shortly thereafter, Neal ran back down the stairs towards Clement, who was still standing in the doorway to the apartment. Clement tried to shut the door and, when the door did not close, he started shooting at Neal. Neal died from his injuries. When police arrived, Clement admitted to shooting Neal and told police where to find his gun. The State charged Clement with murder in the first degree and armed criminal action. The case proceeded to a jury trial.

At trial, Clement testified in his own defense, maintaining that he shot Neal because Neal threatened him and then ran back down the stairs towards him "[f]ast and hard as if he was charging." Clement feared Neal would harm him or his family, who were behind him inside Simpson's apartment, because "[Neal] said he was going to f*** me up so I believed him."

---

[1] After the shooting, Clement and Henley recognized each other from high school. They were unable to see each other clearly during the confrontation because Henley was not facing Clement.

2

Clement testified that he tried to slam the door shut, but "it hit [his] leg and popped back open or [] it caught [Neal's] hand and popped back open."

In addition to Clement, multiple witnesses testified at trial regarding the events leading up to the shooting. We summarize the relevant testimony as follows:

Henley testified that he arrived at the apartment complex that night with his girlfriend, Egypt Lennon ("Girlfriend"), and Neal. Neal was staying at Henley and Girlfriend's apartment on the third floor above Simpson's apartment. Henley testified that Neal tripped over a barbeque pit outside Simpson's apartment door. After helping him up, Henley stated that he began pushing Neal up the steps "[b]ecause he was drunk." Henley testified he was not facing Clement while he pushed Neal up the stairs, so Henley did not see who opened the door or whether anyone had a gun. Henley testified that Neal was upset and repeatedly stated that Clement had a gun. Henley told Neal to forget about the gun, but Neal ignored him and continued to argue with Clement. Once they reached the top of the stairs, Henley testified that Neal pushed him to the ground and "walked back down the steps with his hands out—reach[ing]." Henley testified that Neal was still on the stairs, but near the bottom, when Clement shot him. Henley estimated that Neal was "a couple feet" or "four or five" feet away from the apartment door when the shooting took place, meaning the bottom of the staircase was four to five feet from the doorway to Simpson's apartment.

Malaysia Worthy ("Neighbor") lived in the apartment directly across from Simpson. Neighbor testified that she heard arguing outside her apartment on the night in question. When Neighbor opened her door to ask them to be quiet, she saw Clement standing in the doorway across from her apartment holding a gun. Neighbor also described Neal as upset. Neighbor further testified that Henley was grabbing Neal and trying to walk him up the stairs while Neal

3

and Clement were yelling at each other. Neighbor was still watching from her front door when Neal came back down the stairs. Neighbor testified that Neal was "pacing [or running] down the steps" and that Clement started shooting when Neal reached the landing at the bottom of the stairs. Neighbor testified that Clement was still standing in the doorway of Simpson's apartment before she took cover from the gunfire. Neighbor reemerged from her apartment and found Neal lying directly outside of her apartment door. Additionally, Neighbor estimated that the distance from the base of the steps to the front door of Simpson's apartment was about eight to ten feet.

Girlfriend testified that she walked up to the third floor after Neal tripped and fell into Simpson's apartment door. Girlfriend had already made it to the third floor when Clement confronted Neal and Henley. Girlfriend testified that she could hear them arguing about whether or not Neal and Henley were trying to break in to Simpson's apartment. Girlfriend saw Henley walk Neal to the top of the stairs before Neal pushed Henley down and went back down the stairs. During her direct examination, Girlfriend described Neal as "stumbling down the steps with his arms open." On cross-examination, Clement impeached Girlfriend with a portion of her statement given to the police after the incident where she stated "[Neal] ran downstairs . . . but the way he ran down it seemed like he was trying to attack him." Girlfriend testified that Neal was almost at the bottom of the steps when she heard the gunshots.

Several law enforcement officers also testified at trial about their investigation and the physical evidence. Officer Kyle Bashaw ("Officer Bashaw"), one of the first responding officers, testified that Clement identified himself as the shooter and told him where he left the gun. Officer Bashaw also identified from a crime scene photo that blood was "two feet, three feet" away from Simpson's front door. Detective Christine Romo ("Detective Romo"), a crime scene investigator with the Saint Louis County Police Department, seized ten cartridge casings

4

and one bullet projectile from the scene. Romo testified that six of the ten casings were located inside Simpson's apartment. Detective Romo identified photographs depicting three cartridge casings against the back wall and three to the left as you walk in the door of Simpson's apartment. Detective Romo also testified that blood on the landing was "very close" to the front door of Simpson's apartment and that there was "blood pretty much everywhere."

Kamal Sabharwal ("Sabharwal"), a medical examiner for Saint Louis County, testified regarding the post-mortem examination of Neal. Neal had eight gunshot entrance wounds, including three on his back that exited his chest and abdomen, one on his left front deltoid, and one on his right forearm. Sabharwal determined the cause of death to be "gunshot wounds of chest and abdomen."

At the close of all evidence, Clement submitted jury instructions for general self-defense, defense of third persons, and the Castle Doctrine. The trial court provided the jurors with instructions for general self-defense and defense of others, but over Clement's objection, refused to submit a Castle Doctrine instruction.[2] The Castle Doctrine instruction proffered by Clement was patterned after MAI-CR 406.10 and read as follows:

> One of the issues in this case is whether the use of deadly force by the defendant against Larry Neal was lawful. On the issue of self-defense in this case, you are instructed as follows:
>
> In this state the use of physical force, including the use of deadly force, by a person lawfully occupying a residence, is lawful in certain situations.
>
> A person who is lawfully occupying a residence may use physical force, including deadly force, to defend himself against another person who attempts to enter unlawfully that residence if he reasonably believes the use of some physical force is necessary to defend himself from what he reasonably believes is the use or imminent use of unlawful physical force.

---

[2] All instructions were patterned after the Missouri Approved Instructions-Criminal 4th Edition (2018) ("MAI-CR"). Clement submitted the general self-defense instruction under MAI-CR 406.06, defense of third persons under MAI-CR 406.08, and the Castle Doctrine instruction under MAI-CR 406.10.

A person is not required to retreat before [resorting] to the use of physical force to defend himself if he is lawfully entering a residence.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.

As used in this instruction, the term *"reasonably believe" means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief.* This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

As used in this instruction, a person "unlawfully enters" a dwelling when he enters such dwelling and is not licensed or privileged to do so. . . .

As used in this instruction, a person *"attempts to enter unlawfully"* when, with a purpose to enter unlawfully, he takes a substantial step toward entering unlawfully. *A substantial step means conduct which is strongly corroborative of the person's firmness to complete the unlawful entry.* It does not matter that it was factually or legally impossible to complete the entry if such entry could have been made had the circumstances been as the person believed them to be.

As used in this instruction, "deadly force" means physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.

. . .

As used in this instruction, the term *"residence"* means a dwelling in which a person resides either temporarily or permanently, *or is visiting as an invited guest*.

If any threats against the defendant were made by Larry Neal and were known by or had been communicated to the defendant, you may consider this evidence in determining whether the defendant reasonably believed that the use of force was necessary to defend himself from what he reasonably believed to be the use or imminent use of unlawful force by Larry Neal.[3]

(Emphasis added).

---

[3] We note that Clement did not include the refused instruction in his appendix *as required* under Rule 84.04(h). However, the refused instruction was included in the argument section of his brief as required under 84.04(e) and also was recorded in the trial transcript that is part of the record on appeal. Because Clement substantially complied with Rule 84.04 for purposes of our review, we will consider his appeal. See State v. Villeme, 574 S.W.3d 821, 824 (Mo. App. E.D. 2019) (declining to grant appellate review where the contested instruction was wholly absent from the record on appeal). Counsel is cautioned that the failure to include the challenged instructions in the appendix as required by the appellate rules of procedure could result in a dismissal of the appeal.

The trial court reasoned there was insufficient evidence to support a Castle Doctrine instruction because Clement "very clearly testified on the stand as to what was going in his head, and one was to protect himself and others and protect his family . . . not the residence." The trial court instructed the jury on general self-defense and defense of third persons.

The jury convicted Clement of murder in the first degree and armed criminal action. Clement filed a motion for new trial alleging, among other claims, that the trial court erred in refusing to instruct the jury on the Castle Doctrine. At the sentencing hearing, the trial court denied Clement's motion for new trial and sentenced Clement to life in prison without the eligibility of parole for murder in the first degree and ten years in prison for armed criminal action, with the sentences to run concurrently. Clement now appeals.

## Point on Appeal

In his sole point on appeal, Clement argues the trial court erred where it refused to instruct the jury on the Castle Doctrine as requested by him. Clement maintains there is substantial evidence in the record that he was lawfully occupying a residence and reasonably believed that the use of deadly force was necessary to defend himself or others against the use or imminent use of unlawful force by Neal, who was attempting to unlawfully enter the residence.

## Standard of Review

"This Court reviews de novo a trial court's decision whether to give a requested jury instruction." Straughter, 643 S.W.3d at 321 (quoting Bruner, 541 S.W.3d at 534). When we review a trial court's refusal to instruct the jury on self-defense, we view the evidence in the light most favorable to the defendant and submitting the requested instruction. Id. (citing Bruner, 541 S.W.3d at 530, 534) (internal quotations omitted). A defendant is entitled to a requested instruction when "the evidence tends to establish the defendant's theory, or supports differing conclusions." Id. (quoting State v. Westfall, 75 S.W.3d 278, 280 (Mo. banc 2002)). We "will

7

reverse due to instructional error if there is error in failing to submit an instruction and resulting prejudice to the defendant." State v. Whitaker, 636 S.W.3d 569, 572 (Mo. banc 2022) (citing Westfall, 75 S.W.3d at 280).

Discussion

Clement seeks relief from the alleged prejudice resulting from the trials court's erroneous refusal to instruct the jury on self-defense under the Castle Doctrine. Instructing a jury on claims of self-defense is a well-recognized right of persons charged with violent criminal conduct. Missouri law recognizes that "[a] defendant is entitled to a self-defense instruction if substantial evidence and the reasonable inferences drawn therefrom support the theory propounded in the requested instruction." Straughter, 643 S.W.3d at 321 (citing State v. Barnett, 577 S.W.3d 124, 126 (Mo. banc 2019); Westfall, 75 S.W.3d at 280)). The measure of what level of evidence constitutes substantial evidence is not extraordinarily high. See State v. Hudson, 643 S.W.3d 679, 686 (Mo. App. W.D. 2022) (citing Pendleton v. State, 570 S.W.3d 658, 663 (Mo. App. W.D. 2019)). A party meets the threshold for the requirement of substantial evidence when "there is evidence putting a matter in issue." Straughter, 643 S.W.3d at 321 (quoting Bruner, 541 S.W.3d at 535). "The [trial] court must submit a self-defense instruction when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony[.]" Whitaker, 636 S.W.3d at 574 (quoting Bruner, 541 S.W.3d at 534). The presence of conflicting evidence in the record favors giving the requested instruction because "[a]ny conflict in the evidence is to be resolved by a jury properly instructed on the issues." Kelley v. State, 618 S.W.3d 722, 732 (Mo. App. W.D. 2021) (internal citation omitted).

Important to our resolution of this appeal is the heightened level of statutory self-defense provided by the Missouri legislature under the Castle Doctrine. See Straughter, 643 S.W.3d at 326–27. Unlike the general principle of self-defense or defense of others, a person need not face

8

death, serious physical injury or a forcible felony to respond with deadly force under Missouri's codified Castle Doctrine. See Section 563.031.2(2).[4] Instead, the Missouri legislature specifically provides that a person is justified in using deadly force "to defend himself or herself or a third person from what he or she reasonably believes to be the *use or imminent use of unlawful force by such other person*" and "[s]uch force is used against a person who unlawfully enters, remains after unlawfully entering, or *attempts to unlawfully enter a dwelling, residence, or a vehicle lawfully occupied by such person.*" Sections 563.031.1, 563.031.2(2) (emphases added). Under Missouri's codified Castle Doctrine, even an attempt to unlawfully enter a dwelling may be answered with deadly force. See State v. Clinch, 335 S.W.3d 579, 588 (Mo. App. W.D. 2011) ("[T]he unlawful entry into a dwelling, residence, or vehicle constitutes the act of force necessary to justify deadly force."). If there is substantial evidence to support each element of the Castle Doctrine, the trial court is required to give the instruction. See Straughter, 643 S.W.3d at 322 (citing Sections 563.031.1, 563.031.2(2)).

The parties do not dispute that Clement lawfully occupied the apartment at the time of the shooting. See Section 563.031.2(2). Therefore, the question before us is whether the record contains substantial evidence that Clement (1) reasonably believed that Neal posed an imminent threat of using unlawful force against him and (2) that Neal was attempting to enter Simpson's apartment, such that the trial court erred in refusing to instruct the jury on the Castle Doctrine.

The first contested element is the "use or imminent use of unlawful force." We must determine from the record whether there is substantial evidence for Clement to reasonably believe that Neal posed an imminent threat of unlawful force. Critically, we recognize that "[s]ubstantial evidence of self-defense requiring instruction may come from the defendant's

---

[4] All Section references are to RSMo (2016), unless otherwise indicated.

9

testimony alone as long as the testimony contains some evidence tending to show that he acted in self-defense." Bruner, 541 S.W.3d at 535 (quoting Westfall, 75 S.W.3d at 280). Viewing the evidence in the light most favorable to giving the requested instruction, Clement testified that he heard someone crash into the apartment door around midnight and opened the door to find Neal and Henley in the hallway. Clement believed the two men were trying to break in. After the men denied that was their intention, as Neal had just stumbled into the door, Neal became angry with Clement for displaying a gun. Neal threatened to "f*** him up." Henley attempted to resolve the confrontation by ushering Neal away and pushing him up the stairs to the third floor. Clement remained standing in the doorway, protecting himself and his family behind him. When Clement saw Neal charging back down the stairs towards the apartment, he testified that he was afraid because earlier "[Neal] said he was going to f*** me up so I believed him." Clement was standing in the doorway of the apartment as Neal charged toward him. Although Missouri law assigns no duty to retreat, Clement tried to shut the door. See Section 563.031.3. When the door popped open, Clement believed it was necessary to respond with force because Neal threatened to use unlawful force against him and Neal was still advancing towards Clement as he stood in the doorway of the apartment.

We are persuaded that Clement's testimony provides substantial evidence putting the matter at issue as to whether Neal posed an imminent use of unlawful force. See Straughter, 643 S.W.3d at 321 (quoting Bruner, 541 S.W.3d at 535). Generally, the use of deadly force requires a reasonable belief that such deadly force is necessary to protect against death, serious physical injury, or any forcible felony. State v. Akins, 643 S.W.3d 923, 925 (Mo. App. E.D. 2022) (citing Section 563.031.2(1)). The Castle Doctrine, however, allows for the use of deadly force to defend against *any* unlawful force, which is a significantly lower threshold, provided the other

10

elements are satisfied. See Straughter, 643 S.W.3d at 326–27. Neal's threat to "f*** [him] up,"

Neal being pushed away by Henley, and then Neal returning down the stairs to "charge" at the

apartment door where Clement was standing is evidence that could support a finding that

Clement had a credible and reasonable belief that Neal presented an imminent threat of unlawful

force. See id. at 321 (quoting Westfall, 75 S.W.3d at 280). While one may characterize

Clement's testimony as self-serving, that characterization does not undermine Clement's point

on appeal because Clement's testimony alone may constitute substantial evidence requiring the

submission of the Castle Doctrine instruction. See Bruner, 541 S.W.3d at 535 (quoting Westfall,

75 S.W.3d at 280). We also note the presence of additional evidence in the record supporting the

reasonableness of Clement's belief that Neal posed a threat of imminent use of unlawful force.

Neighbor, Girlfriend, and Henley each testified that Neal was upset and yelling at Clement just

before running back down the stairs, suggesting that Neal's threats to physically attack Clement

were credible.

The State seeks to undermine the reasonableness of Clement's belief that any threat of

force was imminent by selectively focusing on testimony about the distance between Neal and

Clement when Neal was shot. We agree that generally, the distance between Neal and the

apartment when Neal was shot is relevant to the issue of the "imminence" of any threat of

unlawful force. The greater the distance between the two suggests any threat of harm to Clement

or his family was less imminent. We also acknowledge that evidence Neal had some bullet

wounds in his back is consistent with the fact that at some point Neal was turned away from

Clement when he was shot, and thus did not pose an imminent threat to Clement. See State v.

Sinks, 652 S.W.3d 322, 343 (Mo. App. E.D. 2022) (citing State v. Williams, 608 S.W.3d 205,

210 (Mo. App. W.D. 2020)) (noting a bullet entrance wound in the back allows for the inference

11

that the victim was retreating, which impacts the reasonableness of a self-defense claim). At trial, multiple witnesses testified regarding the distance between the bottom of the stairs and the doorway where Clement was standing. The witnesses gave conflicting testimony regarding the distance. For example, Henley estimated it was four or five feet, while Neighbor estimated it was eight to ten feet. Although the exact distance between Neal and Clement is unclear from the collective testimony at trial, Neal would have been less than ten feet from Clement when he was shot. Critically, Clement testified that Neal was continuing to charge towards him when Clement decided to use his firearm. Of the eight bullet wounds on Neal's body only three were in Neal's back. Neal was also shot in the front of his left deltoid and right forearm. There is no evidence in the record as to the timing of the bullet wounds. The location of the three bullet wounds in the back does not ***definitively*** disprove the theory of self-defense under the Castle Doctrine. See id. When deciding whether to give the Castle Doctrine instruction, conflicting evidence must be weighed in favor of giving the instruction, such that a jury properly resolves the questions of fact. See Kelley, 618 S.W.3d at 732 (internal citation omitted). It is not for the trial court to weigh the evidence presented and make a determination of what facts should be presented to the jury. See id. When we consider the evidence in totality, and view the evidence in the light most favorable to Clement and submission of the instruction, the jury had before it evidence that Neal charged down the stairs towards Clement from less than ten feet away to follow through on his threat to "f*** him up" before Clement shot him. See Straughter, 643 S.W.3d 321 (citing Bruner, 541 S.W.3d at 530, 534). For these reasons, we are persuaded that Clement presented substantial evidence that his use of force against Neal was necessary to defend himself from what he reasonably believed was the imminent use of unlawful force. See id.

12

Next, we address the element of "attempted unlawful entry." Even if substantial evidence supported Clement's reasonable belief regarding Neal's imminent use of force against him, without substantial evidence of an attempted unlawful entry, the trial court's refusal to give the Castle Doctrine instruction is not reversible error. See Sections 563.031.1, 563.031.2(2). The State suggests the record contains no evidence that Neal was attempting to unlawfully enter Simpson's apartment when Clement shot him.[5] See State v. Young, 597 S.W.3d 214, 227-28 (Mo. App. W.D. 2019) (finding no Castle Doctrine instruction was required where there was no evidence of an attempt or intent to enter the defendant's car given there was no evidence that the victim had an opportunity to exit his own vehicle in order to attempt to enter the defendant's vehicle). The State further maintains that Clement shot Neal before he could have attempted to unlawfully enter the apartment because Neal was shot near the bottom of the stairs. The State contends that Neal was not given the opportunity to attempt to unlawfully enter because Clement shot Neal while he was on the stairs and not closer to Simpson's apartment. Although evidence was presented that Neal stopped at the bottom of the stairs and did not venture further into the hallway, the trial record also contains evidence to the contrary, which at this stage of analysis, must be resolved in favor of giving the instruction. See Kelley, 618 S.W.3d at 732 (internal citation omitted). Specifically, although Neal's body was found at the bottom of the stairs outside Neighbor's apartment, Officer Bashaw testified that blood was found two or three feet from the doorway to Simpson's apartment, and Detective Romo testified blood was found "very close" to the doorway, allowing a reasonable inference under our standard of review that Neal made it past the bottom of the stairs before Clement shot him.

---

[5] In their briefs, both Clement and the State agree that Neal tripping against Simpson's apartment door was not an attempted unlawful entry for purposes of the Castle Doctrine, as it was too remote in time from the shooting.

13

Clement also presented evidence that Neal was much closer to the entry of Simpson's apartment and attempted to unlawfully enter before Clement shot him. Clement and Neighbor both testified that Clement was standing in the doorway of the apartment when he shot Neal. The record contains evidence that six of the ten bullet casings found at the scene were located *inside* Simpson's apartment. The location of so many bullet casings inside the apartment raises an inference that Clement remained in the apartment when he shot Neal. Importantly, Clement testified that he tried to shut the door moments before he fired the first shot, but either his leg *or Neal's hand prevented the door from shutting* fully closed. Given that Clement offered evidence that Neal's hand could have prevented him from slamming the door shut, Clement reasonably could have believed that Neal was close enough to reach the door to Simpson's apartment. See Straughter, 643 S.W.3d at 323 (finding that testimony that the victim's arm "crossed the threshold of the open window" when she punched or slapped the driver inside the car was sufficient to constitute an unlawful entry under the Castle Doctrine). Under the standards set forth in Straughter, Neal would have necessarily "unlawfully entered" the apartment if his hand crossed the threshold of the door, preventing it from closing. See id. Here, the record contains substantial evidence from which a jury reasonably could find that Neal was attempting to unlawfully enter Simpson's apartment when Clement shot him. See id. at 321 (citing Bruner, 541 S.W.3d at 530, 534). Accordingly, the trial court erred in rejecting the Castle Doctrine instruction requested by Clement. See id. (citing Bruner, 541 S.W.3d at 530, 534; Barnett, 577 S.W.3d at 126; Westfall, 75 S.W.3d at 280).

Even though the trial court erred in refusing to instruct the jury on the Castle Doctrine, we must find that said refusal prejudiced Clement before we may reverse the trial court's judgment. See Whitaker, 636 S.W.3d at 572 (citing Westfall, 75 S.W.3d at 280).

14

The State reasons Clement was not prejudiced by the trial court's failure to instruct the jury on the Castle Doctrine because the jury was instructed on the more general principles of self-defense and defense of others, and nevertheless convicted Clement of first-degree murder. The State argues that the jury's rejection of Clement's claim of self-defense or defense of others necessarily undermines any claim of self-defense under the Castle Doctrine. This argument mirrors the trial court's reasoning for initially refusing to submit the Castle Doctrine instruction. The trial court explained it did not believe that there was sufficient evidence to support a Castle Doctrine instruction because Clement did not testify that he was defending the residence itself, only himself and his family. For that reason, Clement was "covered" by the self-defense and defense-of-others instructions and not entitled to the Castle Doctrine instruction. We disagree because the trial court misapplied the law of the statutorily codified Castle Doctrine.

The Castle Doctrine does not require a person to have acted in defense of "the residence" as the trial court suggests. See Section 563.031. Rather, a strict reading of the statute allows the use of deadly force in a broader set of circumstances provided that the actor lawfully occupies a residence and the victim unlawfully enters, remains after entering, or attempts to unlawfully enter the residence. See id. Further, under the relaxed standard enacted by the legislature, to invoke the protection of the Castle Doctrine, Clement need only show that he reasonably believed force was necessary to defend against "the use or imminent use of unlawful force" and not the threat of "death or serious physical injury" required for the more general principle of self-defense or defense of others. See id.

We recognize that the jury, as the arbiter of credibility and factual determinations, ultimately may have concluded that the evidence did not support acquitting Clement on the theory of self-defense under the Castle Doctrine. See State v. Lowery, 652 S.W.3d 783, 788

15

(Mo. App. E.D. 2022) (citing State v. Perkins, 600 S.W.3d 838, 848 (Mo. App. E.D. 2020)).  But the record before us requires that determination be made by the jury, not the trial court.  We are not persuaded that the jury, having found the shooting was not justified under the general self-defense instruction, reasonably could not have found that Clement's use of force against Neal was justified and sanctioned under the lessened standard of the Castle Doctrine.  See Straughter, 643 S.W.3d at 326–27.  Because Clement was entitled to the heightened defense afforded under the Castle Doctrine, there is a reasonable probability that the trial court's refusal to instruct the jury on the Castle Doctrine affected the outcome of the trial.  See id.; Whitaker, 636 S.W.3d at 572 (citing Westfall, 75 S.W.3d at 280).  Therefore, the trial court's refusal to instruct the jury on the Castle Doctrine was prejudicial error.  See Straughter, 643 S.W.3d at 326–27; Kelley, 618 S.W.3d at 732 (internal citation omitted).  Accordingly, we grant the point on appeal.  We vacate the judgment of the trial court and remand to the trial court for a new trial consistent with this opinion.

### Conclusion

The judgment of the trial court is vacated and the case remanded.

_____
KURT S. ODENWALD, Judge

Michael E. Gardner, C.J., concurs.
Kelly C. Broniec, J., concurs.

16