

# Missouri Court of Appeals

## Southern District

### Division Two

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | No. SD36011 |
| | ) | |
| SAMUEL JERRY WHITAKER, | ) | **Filed: October 29, 2020** |
| | ) | |
| Defendant-Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF IRON COUNTY

Honorable Kelly W. Parker

**AFFIRMED**

Samuel Jerry Whitaker ("Defendant") was tried for first-degree murder, armed criminal action, and first-degree burglary.[1] The jury found Defendant not-guilty on the burglary charge, guilty of the statutory lesser-included offense of voluntary manslaughter, and guilty of armed criminal action.[2]

In two points on appeal, Defendant claims the trial court erred in declining to admit into evidence a certified copy of the victim's 1991 Wisconsin aggravated battery

---

[1] *See* sections 565.020, 571.015, and 569.160. Unless otherwise noted, all statutory citations are to RSMo 2000.

[2] A defendant may be convicted of an offense included in an offense charged in the indictment or information if "[i]t is specifically denominated by statute as a lesser degree of the offense charged[.]" Section 556.046.1(2), RSMo Cum. Supp. 2013. Defendant was charged with first-degree murder. The lesser-degree offenses of first-degree murder include "[v]oluntary manslaughter under subdivision (1) of subsection 1 of section 565.023[.]" Section 565.025.2(1)(b). Section 565.023.1(1) addresses the offense of voluntary manslaughter involving a "death under the influence of sudden passion arising from adequate cause[.]"

1

conviction and erred in refusing to give one of Defendant's two requested self-defense instructions. Finding no merit in either claim, we affirm.

## The Relevant Evidence

On or about October 28, 2013, Defendant shot and killed Carl Lee Streeval ("Victim"), who was Defendant's neighbor and the husband of Defendant's stepdaughter, Sierra Streeval ("Stepdaughter").

Defendant lived on property in Wayne County that contained three trailer homes. From around 2009 to 2013, Defendant lived in one of those trailers with his wife, Tabitha, and their children. During that same timeframe, Stepdaughter moved into one of the other trailers on the property ("the trailer") with Victim and their children.

In March 2012, Victim and Stepdaughter executed a contract with Defendant to purchase the trailer and the land around it for $9,600. About a year later, Victim moved out of the trailer to live with his girlfriend, and a man named Hayden Swinford ("Hayden") moved in with Stepdaughter. Victim began making threats to Stepdaughter and Hayden, and Stepdaughter obtained an order of protection against Victim. Stepdaughter eventually left Hayden and moved to Texas.

On October 26, 2013 -- after Stepdaughter had moved to Texas and two days before the charged events -- Victim, who had recently been released from incarceration, intended to move back into the trailer, despite the fact that the order of protection required him to stay away from the property. When Victim got to the trailer, he was upset to find Hayden living in it. Victim and Hayden were arguing when Defendant came outside of his trailer and approached them. Victim turned to Defendant and said

2

that he was going to "burn [Defendant's] church[3] to the ground with [Defendant] in it[.]" Law enforcement had been called, and an officer told Victim that he needed to leave the property and was not to return.

Two days later, on the day of the shooting, Victim went to the sheriff's office for help in getting back into the trailer. Victim was told by someone at the sheriff's office that he would need to prove that he owned it. Victim left, and returned later, producing a title certificate for the trailer, along with the purchase contract he had signed with Defendant. At that point, Victim went back to the trailer with an officer accompanying him. Hayden and his mother were already moving items out of the trailer when Victim returned. The officer then left the property when everything appeared to be fine.

Later that day, Defendant went to the sheriff's office and claimed that he had previously reported the title to the trailer stolen. The deputy that Defendant spoke to could find no proof that a report of a stolen title had been made. Defendant also applied for an order of protection against Victim based upon their earlier confrontation.

Defendant next obtained the deed to his property at the recorder of deeds's office. He then took his deed to the Wayne County Sheriff's Office, where he was unsuccessful in trying to get help in removing Victim from the property. Defendant returned to his trailer, where he encountered Victim "mouthing off." Victim threatened to stab Defendant with a steak knife that he was holding. Defendant went to the Chief of police in Piedmont, as well as the Wayne County Sheriff's Office, but neither were able to assist him. Defendant then returned home.

At trial, Defendant provided the following testimony. After he returned to his trailer, Defendant had dinner and some wine to calm his nerves. He could hear Victim

---

[3] Defendant had built a "wilderness temple" on the property.

3

shouting throughout his dinner that Defendant had "until dark to get off the property." After he finished his dinner, Defendant went outside to feed his dog. Victim was still outside, "mouthing off walking around with a gas jug telling [Defendant] he was going to burn the church down with [Defendant] in it." Defendant had his shotgun with him because he was "not going to go outside with [Victim] unarmed[.]"

Victim approached Defendant and tried to take his gun away from him. In response, Defendant shot Victim with a slug that grazed Victim's head. Victim fell to the ground, bleeding profusely from a non-fatal head wound. The two were still screaming and yelling when Victim grabbed the gas jug and ran into the trailer.[4] Defendant looked to the side and saw his son standing there. Defendant told his son "to get the keys to the truck and get out of there" because "[w]e were at war[.]"

After Defendant's son left, Defendant followed Victim into the trailer and got up against the wall of the hallway. Defendant had seen Victim head straight down the hallway into the master bedroom, and he could hear Victim screaming into the phone. Defendant testified, "I told him I said [Victim], I'm sorry I said [Victim] I need to come down there and get this gas jug and I persisted to go straight towards him."

By the time Defendant reached the hall by the master bedroom, Victim had fled into the master bathroom and closed the door. The gas jug was sitting on the carpet in the hall outside the master bedroom. Defendant picked it up. As Defendant was returning down the hallway with the gas jug, he testified that Victim smashed the bathroom door

---

[4] No evidence indicated that anyone was inside the trailer at that time or that anyone believed that it was occupied.

4

against Defendant.[5]  Defendant shot Victim (this time, fatally) and threw the door back at him.  Defendant then exited the trailer with his gun and the gas jug.

While he was hiding in the trailer's bathroom, Victim was on the phone with the 9-1-1 dispatcher ("Dispatcher").  Dispatcher testified that "[Victim] was frantic and he stated that someone was trying to break into his home and that he had been shot."  Victim told Dispatcher that Defendant had shot him in the head, and he was feeling faint because he was bleeding very badly.  Victim told her that he had locked himself in the bathroom and Defendant had come through the door.  The last thing Dispatcher heard Victim say was that he had never missed a payment.  At that point, the call was dropped.

Several witnesses testified at trial to Victim's reputation for violence.  Hayden testified that Victim had threatened him about his being in the trailer, told him that he needed to leave, threatened to stab him, slammed Hayden against the wall, told Hayden he should sleep with one eye open, and left Hayden voicemails in which he threatened to burn the trailer down.  Defendant testified that Victim was a former Navy Seal who fought in Iraq and bragged about having 70 confirmed kills.  Defendant said he knew that Victim had threatened to burn a person's house down and kill their dog, and Sierra told Defendant that Victim had sodomized her.  Defendant also testified that Victim boasted about having spent 10-15 years in prison for assaulting someone.

We will recite additional evidence as necessary to address Defendant's points on appeal.

---

[5] The master bathroom had two doors – one that opened into the master bedroom, and one that opened into the hallway.

**Analysis**

*Point 1 – Certified Copy of Victim's Prior Conviction*

Point 1 claims the trial court abused its discretion (or clearly erred) in refusing to receive into evidence Defendant's Exhibit EE, a certified copy of Victim's 1991 Wisconsin conviction for aggravated battery and theft from a person because "the evidence was appropriate corroboration of [Defendant]'s testimony about the conviction." Defendant claims that the exclusion of Exhibit EE prejudiced him because Defendant's "credibility about his version of events was critical to his defense of self-defense[.]"

"The standard of review for the admission of evidence is abuse of discretion." *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011). "This standard gives the trial court broad leeway in choosing to admit evidence; therefore, an exercise of this discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* (quoting *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009)). Our review is for prejudice, not error alone, and we "will reverse only if the error was so prejudicial it deprived the defendant of a fair trial." *State v. Hein*, 553 S.W.3d 893, 896 (Mo. App. E.D. 2018).

Where, as here, justification is an issue in a criminal case, a defendant may introduce evidence of the victim's prior, specific acts of violence of which the defendant had knowledge, provided that those acts are reasonably related to the crimes with which the defendant is charged. *State v. Ryan*, 229 S.W.3d 281, 285 (Mo. App. S.D. 2007). The defendant will only be allowed to admit evidence of a victim's prior, specific violent acts where:

> (1) other competent evidence has been presented raising the question of self-defense; (2) the defendant shows that he was aware of the specific act

6

or acts of violence; (3) the incidents are not too remote in time; (4) and the incidents are of a quality capable of contributing to the defendant's fear of the victim. [*State v. Waller*, 816 S.W.2d 212, 216 (Mo. banc 1991)]. "Where acts are too remote in time or of a quality substantially different from the act that the defendant accuses the victim of committing, the trial court may decline to admit the proof into evidence." *Id.*

*Id.* The trial court must exercise caution in admitting evidence under this rule. *Id.* Defendant's argument at trial was that the exhibit "was relevant to corroborate that [Defendant] was aware of the conviction." The State argued that the 30-year-old conviction was too remote in time and that the exhibit was a "piece of paper from 1991 that [Defendant] didn't know existed[.]" After considering Defendant's testimony up to that point and the arguments of counsel, the trial court denied admission of Exhibit EE.

Defendant then went on to testify that Victim had bragged about being in prison for 10 to 15 years and had threatened to either kill or rape a neighbor's dog and burn his house down. Defendant also testified that, a couple of months before the shooting, Defendant's stepdaughter told him that Victim had sodomized her.

As argued by the State, the trial court has discretion

to place limitations on the extent to which prior violent acts may be proved. While the defendant should be permitted to substantiate his claim of justification because it informs the jury on the state of the defendant's mind at the time of the incident, and thereby enables the jury to decide whether defendant acted rationally under the circumstances, the trial court should not allow the progress of a criminal trial to become unnecessarily slowed by evidentiary conflicts over matters of questionable relevance.

*Id.* at 286 (quoting *Waller*, 816 S.W.2d at 216).

Exhibit EE, which contains no facts about the offenses, proved that Victim pleaded guilty to aggravated battery and theft from a person in Wisconsin in 1991; it proved nothing about Defendant's knowledge of that conviction or Defendant's state of mind at the time of the charged conduct. The trial court's decision to exclude it from

7

evidence was not clearly against the logic of the circumstances. *See **Primm***, 347 S.W.3d at 70. Point 1 is denied.

*Point 2 – Refusal to Submit Additional Self-Defense Instruction*

Defendant's second point claims the trial court erred in refusing to submit a second proposed self-defense instruction that specifically identified arson as a forcible felony that justified Defendant killing Victim in self-defense because "the law allows deadly force to be used to protect one's self from the forcible felony of arson." Defendant requested that this instruction be given in addition to the self-defense instruction the trial court had already agreed to give, which posited that Defendant had acted in justifiable self-defense based upon Victim's intent to commit the forcible felony of burglary.[6]

We review *de novo* a trial court's decision on whether to give a requested self-defense instruction. ***State v. Bruner***, 541 S.W.3d 529, 534 (Mo. banc 2018). The trial court must submit such a requested instruction if substantial evidence supports it, even if the supporting evidence is inconsistent with the defendant's own testimony. ***Id.*** In conducting this review, we view the evidence in the light most favorable to the submission of the requested instruction. ***Id.***

The self-defense statute in effect at the time of the charged conduct provided, in pertinent part, that:

> 1.  A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend *himself or herself* . . . from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person[.]

---

[6] The State did not object to this instruction, and whether it should have been submitted to the jury is not at issue in this appeal.

8

. . . .

2. A person may not use *deadly force* upon another person *under the circumstances specified in subsection 1 of this section* unless: (1) He or she reasonably believes that such deadly force is necessary to protect *himself, or herself* . . . against [1] death, [2] serious physical injury, or [3] any forcible felony[.]

Section 563.031, RSMo Cum. Supp. 2013 (emphasis added).

In addressing the somewhat similar question of whether a property owner is entitled to a self-defense instruction solely because he has no duty to retreat from his own property, the eastern district of our court, in a case of first impression, concluded that:

> (1) the occupier may lawfully use force, including deadly force, to defend himself against a person who is attempting to enter unlawfully, does enter unlawfully, or remains after an unlawful entry; and (2) the occupier is relieved of any duty to retreat before resorting to the use of force; (3) but for the occupier to claim the privilege of self-defense, he must reasonably believe the use of force is necessary to defend himself from what he reasonably believes is an imminent use of force.

*State v. Whipple*, 501 S.W.3d 507, 516 (Mo. App. E.D. 2016). The Eastern District reached this conclusion after interpreting section 563.031 as follows.

> [C]onsidering the entirety of section 563.031 and reading it reasonably and logically, we find that subsection 3 permits the occupier, owner, or lessee to use physical force, including deadly force, in self-defense within a dwelling, residence, or vehicle, or on private property without having a duty to retreat, but only under the circumstances in which physical force, or deadly force, is allowed under subsections 1 and 2. Thus, we cannot find that subsection 3 gives the occupier, owner, or lessee authority to stand his ground and use deadly force without having a reasonable belief that such force is necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful force.

*Id*. at 515. We agree.

More importantly, we do not believe this interpretation to be inconsistent with our high court's holding in *State v. Barnett* that:

9

Pursuant to the self-defense statute, "A person may ... use physical force upon another person" if the person (1) was not the initial aggressor; and (2) "reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person...." [Section] 563.031.1.[] [RSMo Supp. 2013] A person can only use deadly force when he or she "reasonably believes that such deadly force is necessary to protect *himself or herself* ... against death, serious physical injury, or any forcible felony." [Section] 563.031.2(1). Therefore, if there was substantial evidence to support each of the following, the circuit court was required to give an instruction on self-defense: [the defendant] (1) was not the initial aggressor, and (2) reasonably believed the use of deadly force was necessary to protect *himself* from death, serious physical injury, or a forcible felony. *See* [section] 563.031; MAI-CR3d 306.06A; [*State v.*] *Smith*, 456 S.W.3d [849,] 852 [(Mo. banc 2015)].

577 S.W.3d 124, 128 (Mo. banc 2019) (emphasis added).[7]

As previously noted, Defendant offered two self-defense instructions at trial. The first asserted that Defendant permissibly used deadly force to defend himself from "the imminent use of unlawful force or imminent commission of burglary or arson by [Victim.]" The trial court rejected this instruction,[8] but it did submit the self-defense instruction requested by Defendant that stated, "[D]efendant reasonably believed that the use of deadly force was necessary to protect himself from death or serious physical injury from the acts of [Victim], or the commission of burglary by [Victim]" (which did not contain the requested inclusion of "or arson").

In support of his argument that the refusal was erroneous, Defendant claims that he had "ample justification to believe that [Victim] was going to burn down the [trailer]

---

[7] While the self-defense statute was modified in 2016 "only in the duty to retreat[,]" **Barnett** applied the same version of the statute in effect here. 577 S.W.3d at 128 n.3; ***State v. Bruner***, 541 S.W.3d 529, 536 n.6 (Mo. banc 2018). Because a direct threat of death or serious physical injury to the defendants was at issue in both **Bruner** and **Barnett**, our high court did not have to determine whether a forcible felony that did not involve a threat to the defendant's person would have been sufficient to mandate that a self-defense instruction be submitted to the jury.

[8] Although the trial court refused to give that instruction because "the Defendant's own testimony was that he had already obtained the gas can and was leaving the residence when the shots were fired[,]" as noted in **Bruner**, a self-defense instruction must be submitted if any evidence supports it, even if that evidence is contrary to testimony provided by the defendant. 541 S.W.3d at 534.

10

and in the heat of the moment may have genuinely believed that deadly force was necessary to stop it." Defendant claims the jury may have had doubts about whether Victim was committing burglary, given the disputed ownership of the trailer. Further, Defendant argues that the jury already believed him "to some degree" because it convicted him of voluntary manslaughter instead of first- or second-degree murder, and voluntary manslaughter requires a finding that Defendant acted out of sudden passion arising out of adequate cause – emotions and influences he claims are consistent with self-defense. Defendant also cites the fact that Victim had, on multiple occasions, threatened to burn things down, and Victim was found to have two lighters -- and no cigarettes -- on his body after his death.

Defendant's argument fails to recognize that, "[w]hile the law relieves an occupier, owner, or lessee of his duty to retreat, it does not provide him a right to stand his ground and use deadly force without the use of force being necessary to save his own life or protect himself from serious physical harm." *Whipple*, 501 S.W.3d at 516.

Further, none of these cases strike us as inconsistent with our high court's prior admonition that "[a] self-defense instruction is not appropriate if the defendant renewed or continued the confrontation, because behavior of that sort is inconsistent with the requirement that defendant avoid the danger and the need to take a life." *State v. Thomas*, 161 S.W.3d 377, 379 (Mo. banc 2005).

Here, Defendant chose to continue his confrontation with Victim by pursuing him into the trailer when he could have easily disengaged by simply leaving the scene – the same thing Defendant had told his son to do. Such conduct "precludes a plea of self-defense because [Defendant] did not do everything within [his] power, consistent with

11

[his] personal safety, to avoid the danger and the need to take a life." *Id.* at 380. Even after Victim had barricaded himself in the master bathroom, Defendant continued to pursue Victim. "When an accused has an opportunity to decline or abandon the altercation and does not, he then becomes an aggressor, whether or not he initiated the initial altercation." *State v. Gheen*, 41 S.W.3d 598, 606 (Mo. App. W.D. 2001).

Because Defendant did not need to pursue and kill Victim to protect himself from imminent physical harm, the trial court did not err in refusing Defendant's self-defense instruction based upon the forcible felony of arson. *See Smith*, 456 S.W.3d at 852.

Point 2 is also denied, and the judgment is affirmed.

DON E. BURRELL, J. – OPINION AUTHOR

JEFFREY W. BATES, P.J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS