

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED109710 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Cape Girardeau County |
| vs. | ) | |
| | ) | Honorable Benjamin F. Lewis |
| ANTHONY LEVAR SINKS, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 5, 2022 |

Introduction

Anthony Levar Sinks ("Sinks") appeals from the trial court's judgment following a bench trial convicting him on charges of first-degree murder and armed criminal action for the shooting death of Derwin Simmons ("Victim"). Sinks raises three points on appeal, each of which focus on his claim of self-defense. Point One contends the trial court misapplied Section 563.031[1] and misstated the law when observing that Sinks was required to wait and see if Victim had a gun before defending himself. We treat Point Two as a challenge to the sufficiency of the State's evidence that Sinks did not kill Victim in self-defense. In particular, Sinks argues the record contained uncontroverted facts showing that Victim was the initial aggressor and that a reasonable person in Sinks's position would have believed the use of deadly force was necessary to defend himself against Victim. Point Three asserts the trial court wrongfully excluded

---

[1] All Section references are to RSMo (2016), unless otherwise indicated.

testimony that Sinks witnessed Victim seriously injure someone fifteen years earlier because the evidence was relevant to his knowledge of the threat posed by Victim. Because the trial court did not misstate or misapply the law when commenting on the particular facts undermining Sinks's defense of justification, Point One is denied. Because the record lacks undisputed and uncontradicted evidence that Sinks had a reasonable belief that he was justified in using deadly force when he shot and killed Victim, the State presented sufficient evidence from which the trial court, as the trier of fact, reasonably could find that Sinks did not shoot Victim in self-defense. The trial court thus did not err in denying Sinks's motion for acquittal, and we deny Point Two. Because the testimony as to Victim's violent act fifteen years earlier was remote, only speculatively relevant to interpreting Victim's text message to Sinks, and cumulative to other admissible evidence regarding Sinks's knowledge of Victim, the trial court did not prejudicially err in excluding such evidence, and we deny Point Three. Accordingly, we affirm the trial court's judgment.

Factual and Procedural History

Sinks shot Victim to death inside a Hardee's restaurant in Cape Girardeau on August 1, 2018. The following facts are presented in the light most favorable to conviction. See State v. Jones, 553 S.W.3d 909, 911 (Mo. App. S.D. 2018) (citing State v. Lammers, 479 S.W.3d 624, 632 (Mo. banc 2016)).

Sinks's ex-wife ("Ex-Wife") was engaged to Victim at the time of the shooting. Sinks and Ex-Wife had been married twice and had one son ("Son") born in 2012. Sinks and Ex-Wife separated again in 2015, after which they began seeing other people. Sinks struggled with the separation and demanded to know about anyone Ex-Wife was seeing romantically.

Ex-Wife began dating Victim during her separation from Sinks. Sinks and Victim had been friends since the early 2000's. They remained in occasional contact, and Sinks considered

2

Victim a friend before he learned of Victim and Ex-Wife's relationship. Victim lived in Ohio and would visit his teenage son ("K.T.S."), who lived in Cape Girardeau with the child's mother. Ex-Wife did not tell Sinks that she was dating Victim because she believed Sinks would have been angered by the relationship. In November 2017, Ex-Wife filed for divorce, which Sinks opposed. Sinks continued to question Ex-Wife about whom she was dating and threatened her significant other. Sinks's text messages included the following:

- "Don't get with a dude I'll have to bury over my son."
- "You just need to make sure you get with somebody that understands I'm not happy how this is playing out."
- "I'm sure you'll make a wise decision. If I don't like 'em, I'm going to address it period."
- "All I know is I am waiting on the dude that is willing to say I'm in love with [Ex-Wife] and I am not scared of you. I'm willing to kill or be killed for her. That's the man I wanna confront."
- "Well, let's just see what he's made of. Let's meet."
- "It's not a felony to violate a restraining order [un]til you go to court for it three times. I won't need but one meeting with [the] dude."

Ex-Wife shared Sinks's messages with Victim. In January 2018, Ex-Wife obtained an ex parte order of protection against Sinks, which she ultimately chose not to pursue. Sinks continued texting Ex-Wife messages such as the following:

- "I'll have to meet him eventually."
- "And I can't wait. I'm very anxious."
- "I ain't got no more threatening words. I think everyone knows I'm going to be the man that I am about it."
- "I want to know who told you they ain't worried about me. That is so offensive. LHH [laughing hella hard]."

3

Ex-Wife testified that during custody exchanges, Sinks would talk negatively about her dating life and other decisions in front of Son, who was then five years old. Meanwhile, Ex-Wife and Victim began making plans to live together as a family with Son in Ohio. When Ex-Wife told Sinks about moving to Ohio, Sinks told her that she could not take Son away and that if she moved, he would follow her. Sinks again demanded to know the man she was dating, texting that he "can't beat up, poison, snipe, stab, choke, run over, blow up or contract to hit on a whole city. I just want to know where my son might be."

Ex-Wife legally dissolved her marriage to Sinks in March 2018. In June, Ex-Wife told Sinks that she was engaged to Victim and was planning to relocate to Ohio with Victim and Son. Ex-Wife gave Sinks the sixty-days' notice required by the terms of the dissolution decree. Sinks was "off-the-meter angry" about her relocation plans. Sinks filed an objection to Ex-Wife's proposed relocation with Son in the family court, and a hearing was scheduled for August. Ex-Wife told Sinks that Victim would be in town on August 3 to help with her move to Ohio. Sinks responded that he would see Victim face to face, texting, "I'm certain [Victim] will pull up on me eventually. I won't have it any other way," and, "I do my best to be versed in all sorts of self-defense. This is a dangerous world we live in and defense against violence is a topic on everyone's mind. Me personally, I do my best to stay ready."

Sinks was in a group text exchange with Ex-Wife and Victim in which Sinks voiced his concerns that K.T.S. was going to molest Son. When Sinks threatened K.T.S., Victim told Sinks to stop threatening his and K.T.S.'s lives. Victim told Sinks, "[Y]ou know what kind of man I am." Later that day, Sinks texted that he was "going to practice some self-defense." Sinks had no further direct communication with Victim from June 3 until the day of the shooting.

4

In July, Sinks shared a Facebook post that said in part, "a man reaches a certain age where he doesn't want any drama. He doesn't want to fight anyone and if forced to he will not fight fair. He will not quit and there are no weapons he will not use." During this time, Sinks texted other people about Victim, including, "I hope he doesn't try me because if he tries me I will shoot him." At trial, Sinks denied that such statements were threats and explained that he meant only that he would defend himself if Victim tried to hurt him.

The weekend prior to the shooting, Ex-Wife and Sinks met for a custody exchange. Ex-Wife told Sinks that she, Son, and Victim were moving to Ohio as planned. Ex-Wife testified that Sinks told her he would do whatever it took to keep her from moving.

On July 31, the day before the shooting, Sinks contacted his friend, Eric Norman ("Norman"), and asked to borrow a gun. Norman initially hesitated, then Sinks told Norman that Victim was going to be in town, knew where Sinks lived, and that Sinks needed a gun to protect himself. Sinks testified that he told Norman he was not going to look for Victim but that he wanted the gun for self-defense if something terrible happened. Sinks admitted at trial that he already had in mind at this time to use the gun against Victim in self-defense. Norman relented and gave Sinks the gun. That afternoon, after getting the gun from Norman, Sinks went target-shooting with his friend, Micah Stone ("Stone"). Sinks told Stone he was concerned about Ex-Wife moving out of state with Son.

On the day of the shooting, August 1, Sinks attended a business meeting on the campus of Southeast Missouri State University. After the meeting, Sinks asked Stone to meet him at the Hardee's to get something to eat. When Stone met Sinks at the restaurant, they entered the Hardee's and saw Victim and K.T.S. sitting in the front of the restaurant eating breakfast. The trial court found that Sinks and Victim appeared at the Hardee's at the same time coincidentally.

At trial, multiple witnesses testified about the shooting incident. K.T.S. and the Hardee's manager on duty ("Manager") testified for the State, and Sinks and Stone testified for the defense. The Hardee's security video was also entered into evidence, and several witnesses testified in detail regarding its contents, including police officers Orrin Hawkins ("Officer Hawkins") and Jerry Franks ("Det. Franks"). The security video, which had no audio track, contained footage from two camera angles, one with a view of the front counter and one with a limited view of the back of the dining room due to a wall partition.

When Sinks and Stone entered the Hardee's, Sinks recognized Victim and told Stone that he had an issue with Victim. Stone ordered his food and sat down in the back of the restaurant on the same side as Victim and K.T.S. Sinks left the restaurant and went back to his car to get his gun. Sinks was outside the restaurant for two minutes, during which he testified he was "thinking" and "[i]t was a long couple minutes." Sinks testified that in deciding to get his gun, he remembered that Victim had a concealed-carry permit and that in the group chat Victim had said, "you know the kind of person I am," and "there ain't going to be no tongue wrestling when you see me." Sinks took those statements to mean there would be action, not talking, and that he and Victim would fight. Sinks testified that he did not have any formal firearms training but was very interested in defending himself.

Sinks also recalled that "back when we were friends, I saw him beat down someone before." The State objected to the testimony about Victim's prior act, arguing it lacked foundation and was too remote in time. The trial court twice sustained the State's objection. Sinks made an offer of proof, in which he testified that he accompanied Victim when Victim went to beat up a man in a parking lot approximately fifteen years ago. The victim of that beating had been dating the same woman as Victim. Sinks described that victim as being the

6

size of a large football player, over six-feet tall and over 200 pounds with an athletic build, and he recalled that the victim's injuries required stitches. Sinks further testified that Victim had training as a boxer, and Sinks witnessed his fighting skills during that incident. The trial court ruled to exclude the evidence of Victim's prior act.

Testimony about the shooting resumed. When Sinks returned to the restaurant, he gave Victim a salute or a "tip of the hat." The two men acknowledged one another. Sinks placed his order at the counter, then sat down with Stone in the back of the restaurant. Victim put some uneaten food in a bag and asked K.T.S. if he was ready to leave. Sinks returned to the counter to get his cup and filled it at the drink fountain. At this point, Sinks and Victim crossed paths and began a conversation. Neither the Manager, K.T.S., or Stone saw who approached whom, and the partial view from the security video showed Victim walking by Sinks when Sinks rounded the corner with his drink.

Victim addressed Sinks, saying that Sinks had a lot to say on the phone but now Victim was here in person. Victim confronted Sinks about the texts and calls with Ex-Wife, including the threats Sinks had made against Victim and Victim's son. Sinks stated that he had said all he had to say. The conversation initially was not heated, and no one else in the Hardee's seemed to be paying close attention, including K.T.S. Stone turned in his chair to see what was going on. Officer Hawkins testified that the security video shows Victim "messing with" his pants or pockets multiple times, repeatedly putting his hands around his pockets and touching his waistline.

At some point, Victim walked to the front door of the restaurant, held it open, and said to Sinks, "Let's step outside and handle this like men." K.T.S., Stone, and Sinks interpreted Victim's statement as an invitation to go outside and engage in a fist fight. Sinks would not go

7

outside and said, "I'm not going to fight you. That's not what this is." Sinks testified he did not want to fight Victim because he believed Victim would seriously injure him in a fist fight. Sinks told Officer Brian McCain ("Officer McCain") that Victim was a large man and a trained boxer, and that Sinks was in no shape to fight someone like that. Sinks told Victim, "I'm not looking to fight you, bro. I will kill you."

Victim again went to the door and held it open, telling Sinks to go outside with him. Sinks testified Victim was telling him he was going to "beat [his] a—" and "beat [his] face off" and "knock [him] out." Sinks put his drink down. Manager heard Victim say, "not in front of my son." K.T.S. walked to the door, thinking he and Victim were going to leave. Victim said he was going to leave, and Sinks responded that leaving was "a good idea."

Sinks then told Victim, "You know I do have the right to carry. I do have my CCW [concealed carry weapon]." Victim replied, "You know I do as well." At some point, Victim was holding his phone and handed the bag of food to K.T.S. Both Sinks and Victim changed their stances. Sinks stepped out of the security video's frame and "squared off" in a fighting stance with his right foot in front and left foot back. Victim took one step towards Sinks. The two men were approximately four or five feet apart, not close enough to touch, and neither looked scared.

Sinks reached down, displayed that he had a gun, and put his hand on the gun. As Victim reached behind to the back of his pants, Sinks pulled out his gun and shot him. Victim, who was unarmed, immediately turned after being shot. Sinks continued to shoot, firing five shots at Victim who got up once and tried to run away before falling and staying down. At the sound of gunshots, K.T.S. and others in the restaurant ducked for cover behind the counter. Victim had exit wounds in multiple places, including one out of his chest. Sinks testified that he shot at

8

Victim until he did not feel threatened anymore. The security video showed two minutes transpired from when Sinks and Victim first crossed paths to when Sinks shot Victim.

Sinks called the police and told them he shot Victim in self-defense. While lying on the ground, Victim told Sinks, "You didn't have to do this," and Sinks said, "Sorry, I had to." Sinks appeared calm, and he cooperated with the police officers who arrived on the scene. While Officer McCain was transporting Sinks to the police station, Sinks, unprompted, began telling his account of the shooting incident. Sinks continued to freely talk about the events throughout his booking. At one point, he said, "I'm sorry you guys [Victim and Ex-Wife] made this decision to hurt me." He offered his cellphone, indicating it would show his conversations and how he had warned Victim and Ex-Wife, including, "I hope [Victim] doesn't push me" and "I will shoot [Victim] if he tries." Sinks later declined to give consent to a search of his cellphone. Sinks told police officers he felt compelled to tell Victim that if something happened to Son while in Victim's care, there would be problems. Sinks told Det. Franks that he never saw Victim with a gun, Victim never said he had a gun, Victim never said he was going to kill Sinks, and Victim was never close enough to put his hands on Sinks. Sinks said that when he arrived at the Hardee's and saw Victim there, "it was the worst luck [Sinks] could ever have."

The State charged Sinks with first-degree murder and armed criminal action. Sinks argued the shooting was justified under Missouri law as self-defense. Sinks waived his right to a jury trial.

At the bench trial, the State argued that Sinks did not shoot Victim in self-defense. In support of his self-defense argument, Sinks presented expert testimony from Thomas Beardslee ("Beardslee"), a retired law-enforcement trainer with experience training officers and civilians in the use of force. Beardslee offered an opinion based on the security video, which did not have a

9

clear view of the shooting nor any dialogue. Beardslee's only information about the situation between the parties was that there was a custody issue and hard feelings between the shooter and the victim. Beardslee testified that he could not see the actual shooting in the video because the view was obstructed. Nevertheless, Beardslee opined that Victim was the initial aggressor in the encounter because Sinks did not move towards Victim, Victim tried to get Sinks to go outside and fight several times and, after that failed, it was Victim who closed the distance between himself and Sinks.

After the close of all the evidence, the trial court found Sinks guilty on all charges. In rejecting Sinks's claim of self-defense, the trial court explained in part: "[T]he bottom line on that confrontation is that [Victim] never took a swing at [Sinks]. He never punched him. Never got within arm's length of [Sinks]. Never walked and poked him in the chest. He never harmed [Sinks] in any way." The trial court also stated that Sinks "will someday go to his grave still believing that this was self-defense," but noted "the core element that [i]s missing here is reasonableness." At the sentencing hearing, the trial court observed, "When [Victim] reached around behind his back to hitch up his shorts, you had an obligation to wait and see if he had a gun before you shot him[.]" The trial court sentenced Sinks to life in prison on first-degree murder and thirty years on armed criminal action, with the sentences to be served consecutively. Sinks now appeals.

Points on Appeal

Sinks raises three points on appeal. Point One asserts the trial court erred in denying his claim of self-defense and convicting him on first-degree murder and armed criminal action. Specifically, Sinks argues the trial court misapplied Section 563.031 by stating that Sinks had to wait and see if Victim had a gun before he shot at Victim because Sinks was not the initial aggressor and had no duty to retreat. Similar to Sinks's initial point on appeal, Point Two

10

contends the trial court erred in denying Sinks's motion for acquittal at the close of the evidence because that ruling likewise was based on an erroneous application of Section 563.031. However, Point Two also argues that the overwhelming and uncontroverted evidence clearly established the claim of self-defense in that Victim was the initial aggressor and manifested his intent to assault and injure Sinks. Point Three claims the trial court abused its discretion in excluding evidence that Sinks witnessed Victim beating someone fifteen years earlier because the evidence was relevant to the claim of self-defense, and the probative value of such evidence substantially outweighed potential prejudice to the State. In particular, Sinks argues that such evidence was relevant to the reasonableness of Sinks's belief that deadly force was necessary to defend himself against Victim's threatened use of force, and the exclusion of such evidence prejudiced his defense.

Discussion

## I. Point Two—The Trial Court Did Not Err in Rejecting Sinks's Self-Defense Claim

### A. Standard of Review

"In a bench-tried case, we review a trial court's ruling on a motion for judgment of acquittal to determine whether there was sufficient evidence from which the trial court could have found the defendant guilty beyond a reasonable doubt." State v. Peeler, 603 S.W.3d 917, 920 (Mo. App. E.D. 2020) (citing State v. McDowell, 519 S.W.3d 828, 837 (Mo. App. E.D. 2017)). We apply the same standard of review for sufficiency-of-the-evidence challenges in bench-tried cases as in jury-tried cases. Id. (citing State v. Brown, 360 S.W.3d 919, 922 (Mo. App. W.D. 2012)); see also State v. Lehman, 617 S.W.3d 843, 847 n.3 (Mo. banc 2021). Our review "is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." Peeler, 603 S.W.3d at 920 (quoting Lammers, 479 S.W.3d at 632). Our review does not

11

assess "whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt." State v. Williams, 608 S.W.3d 205, 209 (Mo. App. W.D. 2020) (quoting State v. Stewart, 560 S.W.3d 531, 533 (Mo. banc 2018)).

Once a defendant has injected a claim of self-defense at trial, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. Id. at 210 (quoting State v. Henderson, 311 S.W.3d 411, 414 (Mo. App. W.D. 2010)); see Section 563.031(5). We will only reverse a trial court's denial of a motion to acquit the defendant of a homicide charge on the grounds of self-defense where undisputed and uncontradicted evidence of self-defense is adduced at trial. Id. at 209 (quoting State v. Clark, 486 S.W.3d 479, 490 (Mo. App. W.D. 2016)). In making that determination, "[t]he evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." Id. (quoting Stewart, 560 S.W.3d at 533) (viewing the evidence in the light most favorable to the guilty verdict in holding sufficient evidence proved the defendant did not reasonably believe deadly force was necessary); Jones, 553 S.W.3d at 913 (citing Lammers, 479 S.W.3d at 632); Henderson, 311 S.W.3d at 413 (internal quotation omitted).

"On appeal from a bench-tried case where the trial court made no findings of fact, we consider all fact issues as having been found in accordance with the result reached." Peeler, 603 S.W.3d at 920 n.1 (internal citation omitted). "We do not weigh the evidence or decide the credibility of witnesses, but defer to the trial court." Clark, 486 S.W.3d at 490 (quoting Henderson, 311 S.W.3d at 413); see also Jones, 553 S.W.3d at 913 (citing State v. Letica, 356

12

`

S.W.3d 157, 167 (Mo. banc 2011)). "The trier of fact may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances, and other testimony in the case." State v. Dodd, 637 S.W.3d 659, 668 (Mo. App. W.D. 2021) (citing State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002) (per curiam)). "The testimony of a single witness is sufficient to support a conviction even if the testimony of the witness is inconsistent." Id. (internal quotation omitted); Peeler, 603 S.W.3d at 922 (internal quotation omitted). However, we "will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences." Peeler, 603 S.W.3d at 920–21 (quoting Lammers, 479 S.W.3d at 632).

"The State may prove its case by presenting direct or circumstantial evidence." Jones, 553 S.W.3d at 913 (internal quotation omitted). "Upon appellate review, circumstantial evidence is given the same weight as direct evidence and the factfinder may make reasonable inferences from the evidence presented." Id. (internal quotation omitted); see also Peeler, 603 S.W.3d at 920 (quoting Brown, 360 S.W.3d at 922) ("Reasonable inferences can be drawn from both direct and circumstantial evidence, and circumstantial evidence alone can be sufficient to support a conviction.").

"To the extent that a sufficiency challenge raises an issue of statutory interpretation, we conduct de novo review. State v. Dickerson, 609 S.W.3d 839, 844 (Mo. App. E.D. 2020) (citing State v. Bernhardt, 338 S.W.3d 830, 834 (Mo. App. E.D. 2011)). We review all questions of law de novo without deference to the trial court. State v. Hunter, 626 S.W.3d 867, 874 (Mo. App. E.D. 2021) (citing State v. Smith, 595 S.W.3d 143, 145 (Mo. banc 2020)).

B.     Analysis

    1.     **Interpreting Sinks's Second Point on Appeal**

13

Preliminarily, the State discerns that Point Two presents a challenge to the sufficiency of the State's evidence that Sinks did not shoot Victim in self-defense. To be sure, Point Two is somewhat confusing. Sinks does not present Point Two as a sufficiency challenge as the point begins and ends with a distinct focus on how the trial court erred in denying Sinks's motion for acquittal due to its erroneous application of Section 563.031. However, much of Point Two alleges that overwhelming and uncontroverted evidence was adduced at trial proving that Sinks had a reasonable belief that deadly force was necessary to protect himself against a forcible felony, serious injury, or death. For this reason, we reasonably interpret Sinks's argument as a challenge to the sufficiency of evidence. Were we not to construe Point Two as a sufficiency challenge, the second point would present multifarious arguments that preserve nothing for appeal under Rule 84.04.[2] See Dodd, 637 S.W.3d at 666 (internal quotation omitted) ("Multiple claims of error in one point relied on renders the point multifarious and as such is a violation of Rule 84.04, made applicable to briefs in criminal appeals by [Mo. R. Crim. P.] 30.06[.]"); see also State v. S.F., 483 S.W.3d 385, 389 n.6 (Mo. banc 2016). Moreover, the language in Point Two relating to the trial court's alleged incorrect interpretation and application of the self-defense statute is separately raised in Point One. In his reply brief, Sinks does not dispute the State's interpretation of Point Two as a sufficiency challenge, and Sinks again focuses on the facts in the record when reasserting that the State failed to prove beyond a reasonable doubt that Sinks did not shoot Victim in self-defense. Accordingly, we construe Point Two as a sufficiency challenge in Sinks's favor and address it accordingly. See id. (internal citation omitted) (noting we may exercise our discretion to review the merits of an appellant's argument that is readily understandable).

---

[2] All Rule references are to Mo. R. Civ. P. (2021), unless otherwise indicated.

14

The State further suggests that Sinks's argument in Point Two must fail because Sinks applies an incorrect standard of review. See Rule 84.04(e); State v. Myers, 619 S.W.3d 578, 583 (Mo. App. E.D. 2021) (internal quotation omitted) ("[T]he standard of review is essential to all appellate arguments, as it outlines [our] role in disposing of the matter before [us].").  Indeed, Sinks mistakenly presents his argument by construing the evidence in the light most favorable to him.  Sinks's error is that with a claim based upon sufficiency of the evidence, we are required to view the evidence in the light most favorable to the judgment.  See Jones, 553 S.W.3d at 915–16 (internal citation omitted) (finding a defendant's reliance on evidence supporting his own position was unavailing in challenging the sufficiency of the State's evidence that he did not act in self-defense); see also State v. Hooper, 552 S.W.3d 123, 137 (Mo. App. S.D. 2018) (internal citation omitted) (emphasis in original) ("[A]n appellant's most fundamental task in a sufficiency-of-the-evidence challenge [is] to account for *all* of the favorable evidence in the record, and *all* the reasonable available inferences therefrom, that could support its challenged factual proposition, and then confront and dispel the probative value attending the same supportive evidence and inferences.").  While Sinks correctly notes that the standard of review of statutory interpretation is de novo review, he omits any mention of the standard of review when reviewing the facts in evidence.  Notably, in his argument, Sinks misguidedly presents the facts in the light most favorable to acquittal—and not in the light most favorable to the judgment.  See Jones, 553 S.W.3d at 916.

While we review questions of law de novo, we must defer to the factfinder's assessment of the evidence.  See Hunter, 626 S.W.3d at 874, 876 (internal quotation omitted) ("When the facts relevant to an issue are contested, [we] defer[] to the trial court's assessment of the evidence; it is only when the evidence is uncontested that no deference is given to the trial

15

court's findings."). Moreover, it is well established in Missouri that an appellant cannot prevail on a substantial-evidence argument in a self-defense case premised solely on the existence of some evidence in the record that is favorable to a self-defense claim. See Jones, 553 S.W.3d at 915–16 (internal citation omitted). Sinks perhaps mistakenly applies the standard of review relating to a self-defense jury instruction. When deciding if the jury must be instructed on self-defense, the trial court must view the evidence in the light *most favorable to giving the instruction.* See, e.g., State v. Whitaker, 636 S.W.3d 569, 574 (Mo. banc 2022) (quoting State v. Bruner, 541 S.W.3d 529, 534 (Mo. banc 2018)) ("In determining whether the circuit court erred in refusing to submit an instruction on self-defense, the evidence is viewed in the light most favorable to the defendant."). But jury instructions are not at issue here, as Sinks fully presented his claim of self-defense at the bench trial. The trial court rejected Sinks's defense based upon the evidence adduced at trial. As explained in the standard-of-review section above, we therefore review the evidence in the light most favorable to the judgment. See Williams, 608 S.W.3d at 209 (quoting Stewart, 560 S.W.3d at 533); Henderson, 311 S.W.3d at 413 (internal quotation omitted); see also Hunter, 626 S.W.3d at 876 (internal quotation omitted).

By focusing narrowly on the evidence in the light most favorable to acquittal, Sinks's otherwise understandable arguments are filtered through a lens that skews the facts in his favor. See Myers, 619 S.W.3d at 583 (internal citation omitted); Hooper, 552 S.W.3d at 137 (internal citation omitted). Sinks also declined to address the standard-of-review issue raised by the State in his reply briefing, though he renewed his arguments that the facts in the record supported acquittal under the applicable law. Sinks's arguments are clear, and the State supplies the necessary factual considerations that we must credit to the factfinder. Thus, the parties' briefing enables us to conduct a meaningful review without improperly becoming an advocate for the

16

appellant.  See Dodd, 637 S.W.3d at 666 (internal citation omitted); Myers, 619 S.W.3d at 585 (internal quotation omitted).  We therefore exercise our discretion to review Point Two.  See Dodd, 637 S.W.3d at 666 (internal citation omitted).

### 2.      Applying Missouri's Self-Defense Statute

Self-defense is an absolute defense to criminal prosecution for homicide offenses.  State v. Oates, 540 S.W.3d 858, 861 (Mo. banc 2018) (citing Section 563.074.1).  "Once the defendant has injected the issue of self-defense into the case, the burden shifts to the [S]tate to prove the absence of self-defense beyond a reasonable doubt."  Williams, 608 S.W.3d at 210 (quoting Henderson, 311 S.W.3d at 414); Jones, 553 S.W.3d at 914 (quoting Bruner, 541 S.W.3d at 530); see Section 563.031.5 (providing that "the burden shall then be on the [S]tate to prove beyond a reasonable doubt that the defendant did not reasonably believe that the use of such force was necessary to defend against what he or she reasonably believed was the use or imminent use of unlawful force").

Critical to our analysis, "[a] person is entitled to acquittal as a matter of law on the basis of self-defense *only if there is undisputed and uncontradicted evidence clearly establishing self-defense*."  Williams, 608 S.W.3d at 209 (quoting Clark, 486 S.W.3d at 490) (emphasis added).  When evaluating a motion for acquittal based on the evidence of self-defense presented at trial, "[r]arely is self-defense declared by law so as to bar the submission of the homicide offense altogether."  Jones, 553 S.W.3d at 914 (quoting State v. Morley, 748 S.W.2d 66, 68 (Mo. App. S.D. 1988)) (emphasis omitted); see also State v. Watson, 839 S.W.2d 611, 615 (Mo. App. E.D. 1992).  Rather, "[a]cquittal of an accused by reason of self-defense as a matter of law . . . is relegated to those *exceptionally rare instances* where *all the undisputed and uncontradicted*

17

*evidence clearly establishes self-defense.*" <u>Jones</u>, 553 S.W.3d at 914 (quoting <u>Morley</u>, 748

S.W.2d at 68) (emphasis in original).

To determine whether undisputed and uncontradicted evidence clearly established Sinks

shot Victim in self-defense, we apply Section 563.031, the relevant parts of which are as follows:

> 1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person, unless:
>
>> (1) The actor was the initial aggressor; except that in such case his or her use of force is nevertheless justifiable provided:
>>
>>> (a) He or she has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened use of unlawful force . . . [.]
>
> 2. A person shall not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
>
>> (1) He or she reasonably believes that such deadly force is necessary to protect himself, or herself or her unborn child, or another against death, serious physical injury, or any forcible felony . . . [.]

Section 563.031.1–2. The 2016 amendment to the self-defense statute differs from the prior

version only with respect to a person's duty to retreat. <u>State v. Tate</u>, 561 S.W.3d 483, 488 n.1

(Mo. App. E.D. 2018) (citing <u>Bruner</u>, 541 S.W.3d at 536 n.6). Specifically, a person has no duty

to retreat "[i]f the person is in any other location such person has the right to be." Section

563.031.3(3).

It is a fundamental precept that "[d]eadly force is only justifiable when the defendant

reasonably believes that such deadly force is necessary to protect himself [or herself] from death,

serious physical injury, or any forcible felony." <u>Bruner</u>, 541 S.W.3d at 538 (citing Section

563.031). Read together, subsections 1 and 2 justify the use of deadly force only if the defending

18

person reasonably believes that death, serious physical injury, or a forcible felony *is actually occurring or is imminent.* State v. Clinch, 335 S.W.3d 579, 586–87 (Mo. App. W.D. 2011) (citing State v. Thomas, 161 S.W.3d 377, 379 (Mo. banc 2005)); see also Dorsey v. State, 113 S.W.3d 311, 317 (Mo. App. S.D. 2003) (internal citation omitted) ("The use of deadly force in self-defense requires the real or apparently real necessity for the defender to kill or use deadly force to protect himself from immediate danger of serious bodily injury or death.").

"The reasonableness of the belief is determined from an objective test that 'measures conduct based on what a hypothetical ordinary reasonable and prudent person would have believed and how they would have reacted.'" Hendrix v. State, 369 S.W.3d 93, 98 (Mo. App. W.D. 2012) (internal quotation omitted). A reasonable belief is one "based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief . . . [which] depends upon how the facts reasonably appeared [and] does not depend upon whether the belief turned out to be true or false." Bruner, 541 S.W.3d at 536 (quoting State v. Smith, 456 S.W.3d 849, 852 (Mo. banc 2015)). "'Deadly force' means 'physical force which is used with the purpose of causing or which a person knows to create a substantial risk of causing death or serious physical injury.'" Id. (quoting Smith, 456 S.W.3d at 852). A "forcible felony" is defined as "any felony involving the use or threat of physical force or violence against any individual, including but not limited to murder, robbery, burglary, arson, kidnapping, assault, and any forcible sexual offense." Section 563.011(3).[3]

In interpreting Sections 563.011 and 563.031, including the forcible-felony language, Missouri courts have repeatedly held that "deadly force cannot be used to repel a simple assault

---

[3] The definitions in Section 563.011 have since been reordered, effective August 28, 2018, after the date of the offense in this case. See Section 563.011 (Cum. Supp. 2018) (renumbering "deadly force" as (2) and "forcible felony" as (4)).

19

and battery." Williams, 608 S.W.3d at 210 (quoting Bruner, 541 S.W.3d at 538) (emphasis omitted); State v. Kendrick, 550 S.W.3d 117, 124 (Mo. App. W.D. 2018) (quoting Bruner, 541 S.W.3d at 538); Dorsey, 113 S.W.3d at 317 (citing Morley, 748 S.W.2d at 68). "To justify the use of deadly force, '[s]ome affirmative action, gesture, or communication by the person feared indicating the immediacy of danger, the inability to avoid or avert it, and the necessity to use deadly force as a last resort must be present.'" State v. Akins, 643 S.W.3d 923, 925 (Mo. App. E.D. 2022) (internal quotation omitted). "Words alone are insufficient to support a claim of self-defense[;] [n]either is deadly force justified in response to fear of being grabbed or even punched." Williams, 608 S.W.3d at 210 (quoting Bruner, 541 S.W.3d at 538) (emphasis omitted) (holding the defendant was not entitled to acquittal as a matter of law because the defendant at most was reacting to the threat of a simple assault such that whether he was justified in acting in defense of another was a question for the factfinder).

Here, the trial court found that Sinks and Victim coincidentally arrived at the Hardee's at the same time. The trial court did not make a specific finding as to whether Sinks or Victim was the initial aggressor in the confrontation, and the parties continue to dispute the issue on appeal. The evidence in the record shows that the two men mutually crossed paths in the restaurant and began a conversation, during which Victim confronted Sinks about the prior threats against him and his son. Victim twice asked Sinks to step outside with him and fight it out. Given the facts before us and Sinks's use of a deadly weapon to shoot Victim, whether Sinks or Victim was the initial-aggressor or failed to withdraw is not determinative of Sinks's claim of self-defense. See Section 563.031.1–2; Tate, 561 S.W.3d at 489 (noting that even a defendant who is not the initial aggressor is not entitled to a self-defense instruction unless the facts that would lead a reasonable person to believe that he was justified in using physical force to protect himself from the use or

20

imminent use of unlawful force). Rather, Sinks may prevail on Point Two only if the facts, when viewed in the light most favorable to conviction, would lead a reasonable person to believe that Sinks was justified *in using deadly force* to protect himself from Victim's use or imminent use of unlawful force. See Section 563.031.1–2; Jones, 553 S.W.3d at 917. We are persuaded that the trial court, as the trier of fact, could properly conclude that Sinks had no such reasonable belief under the facts of this case. Thus, even assuming *arguendo* that Victim was the initial aggressor, Sinks's claim of justifiable self-defense fails because the record contains sufficient evidence from which the trier of fact reasonably could find that Sinks lacked a reasonable belief that he needed to use *deadly force* to protect himself against an imminent use of unlawful force by Victim. See Jones, 553 S.W.3d at 917.

The record supports a finding that Victim and Sinks had an encounter at the Hardee's that became increasingly aggressive. The evidence suggests that the encounter reasonably could be viewed as a testosterone-fueled demonstration of male bravado, often characterized with chest-thumping and invitations to "fight like a man." While the back and forth comments between Sinks and Victim reasonably can be viewed as consistent with a display of such bravado, we are not persuaded that the encounter rose to a level that reasonably could justify Sinks's use of deadly force. We note that Sinks suggests that Victim's prowess at physical altercations was so substantial that the threatened fist-fight presented a real danger of severe injury that could not reasonably be characterized as a simple assault. See Williams, 608 S.W.3d at 210 (quoting Bruner, 541 S.W.3d at 538) (noting deadly force may not be used to repel "a simple assault and battery"); see also Sections 563.011(3), .031.2(1). The crux of Sinks's argument, however, is that the nature of his encounter with Victim changed during the course of the confrontation such that he was no longer threatened by a mere physical assault. See Williams, 608 S.W.3d at 210

21

`

(quoting Bruner, 541 S.W.3d at 538); Kendrick, 550 S.W.3d at 124 (quoting Bruner, 541 S.W.3d at 538); Dorsey, 113 S.W.3d at 317 (citing Morley, 748 S.W.2d at 68). At trial and on appeal, Sinks's self-defense argument specifically differentiates the initial threat—arising from Victim's invitation for the two of them to go outside and fight it out like men—from the subsequent deadly threat that arose when Sinks claims to have believed Victim was reaching for a gun. Sinks testified that the threat of Victim's possession and imminent use of a gun during the altercation justified his shooting of Victim. Specifically, Sinks testified that Victim "reached behind his back and that's the exact moment I felt instant fear for my life[,]" "I thought he was reaching for a gun[,]" and "I thought I was going to be shot." However, Sinks's argument fails in light of our standard of review and the application of the law to the facts in evidence. See Williams, 608 S.W.3d at 209 (citing Stewart, 560 S.W.3d at 533); Jones, 553 S.W.3d at 913 (internal quotation omitted); Henderson, 311 S.W.3d at 413 (internal quotation omitted). In particular, trial testimony about the incident and the security video supports a factual finding that Sinks lacked a reasonable belief that he was faced with imminent unlawful force when he shot and killed Victim. See Hendrix, 369 S.W.3d at 98 (internal quotation omitted).

Sinks directs us to evidence favorable to finding that Victim imminently threatened the use of unlawful force. For example, Sinks suggests that when Victim handed K.T.S. his bag of food and stepped towards him, it was reasonable for Sinks to think that Victim was emptying his hands in order to fight Sinks inside the restaurant since Sinks refused to go outside. While Sinks offers a plausible explanation for Victim's conduct, our standard of review requires us to construe all facts and reasonable inferences favorably to the State, while disregarding contrary evidence and inferences. See Williams, 608 S.W.3d at 209 (quoting Stewart, 560 S.W.3d at 533). Importantly, "[s]elf-defense is an issue for the factfinder when there is conflicting

22

`

evidence or different inferences could be reasonably drawn from the evidence." Jones, 553 S.W.3d at 914 (internal quotation omitted); see also Williams, 608 S.W.3d at 209 (quoting Henderson, 311 S.W.3d at 414). Here, the trial court was the factfinder, and it was within the trial court's authority to weigh the evidence presented and the inferences to be drawn therefrom. "A motion for acquittal on the basis of insufficient evidence is necessarily directed at the State's failure to meet its burden of production—*i.e.*, at the ***absence*** of an evidentiary basis for the jury's [or trial court's] fact-finding." Jones, 553 S.W.3d at 915 (internal citations omitted) (emphasis in original). In this case, Victim said he would not fight Sinks in front of his son, and twice tried to get Sinks to go outside with him. Even if some evidence of Victim's physical behavior reasonably could support an inference that Victim indicated a willingness to fight Sinks inside the restaurant, we must resolve contradictory evidence and inferences favorably to the verdict. See id.; see also Williams, 608 S.W.3d at 209 (internal quotation omitted). We further note that Sinks testified he only reached for his gun after seeing Victim reach behind his back. Sinks testified that he believed Victim was reaching for a gun—a gun Victim had referenced in general comments to Sinks only after Sinks told Victim, "You know I do have the right to carry. I do have my CCW." Victim's only response was: "You know I do as well." Given alternative reasonable inferences supporting the verdict, we cannot charge the trial court with error for rejecting Sinks's position that this single comment not only could have permitted but in fact ***required*** the factfinder to conclude that Sinks had a reasonable belief that Victim was armed and intended to shoot him when Sinks employed deadly force. See Williams, 608 S.W.3d at 209 (internal quotation omitted); Jones, 553 S.W.3d at 914 (internal quotation omitted).

Relatedly, Sinks claims that he never displayed or threatened Victim with a gun during the altercation at Hardee's despite K.T.S.'s testimony to the contrary. As support for his claim,

23

Sinks offers Det. Frank's testimony that the security video does not show Sinks flashing a gun. Again, under our standard of review, we ignore all evidence contrary to the verdict and consider only the evidence favorable to the verdict. See Jones, 553 S.W.3d at 913 (quoting Lammers, 479 S.W.3d at 632). Notwithstanding Det. Frank's testimony, the record contains evidence supporting the verdict. In particular, the record includes testimony from witnesses, including Sinks's proffered expert witness, Beardslee, that the security video provides only an obstructed view of Sinks during the confrontation that did not show what he was doing with his hands when, as K.T.S. testified, he displayed his gun in his pants and put his hand on it.

We must grant the State all reasonable inferences as to a defendant's intentions and motives "from the defendant's conduct before the act, during the act[,] and after the act." Id. at 917 (quoting State v. Montiel, 509 S.W.3d 805, 809 (Mo. App. S.D. 2016)). Sinks testified that when he told Victim, "I'm not trying to fight you, bro. I will kill you," he was simply "making [Victim] aware that if he tries to hurt me I will defend myself with lawful deadly force." Sinks testified that his statement was not a threat to Victim's life, but merely a warning. Sinks further testified that he only threatened to kill Victim *after* Victim said he also had a CCW, emptied his hands by giving his food bag to K.T.S., and stepped towards Sinks. We accord no weight to Sinks's self-serving explanations that the trial court, as the factfinder, plainly rejected as not credible. See Williams, 608 S.W.3d at 209 (internal quotation omitted). The finder of fact is "not bound by defendant's self-serving explanation" but "may choose to accept or reject all, some or none of the testimony of any witness." Id. (internal quotation omitted). A factfinder could reasonably infer that Sinks's statement, "I'm not trying to fight you . . . I will kill you," was a threat against Victim's life, such that Sinks escalated the encounter from an invitation to fight and "handle this like men" outside the restaurant to an immediate deadly encounter.

24

Importantly, Sinks was the only person to display a weapon when he put his hand on his gun prior to shooting Victim, thereby escalating the confrontation to one involving deadly force. See Kendrick, 550 S.W.3d at 124 (quoting Bruner, 541 S.W.3d at 537) (noting that a defendant who "introduced a deadly instrument into what had been, at most, a simple battery and significantly raised the level of violence" cannot inject a claim of self-defense). We note that even under the defendant-favoring standard of review for appeals from a trial court's failure to instruct on self-defense, which views the facts in the light most benefitting the defendant, such a standard does not "transform mere words or threats or simple assaults into justification for using deadly force." Bruner, 541 S.W.3d at 534 n.2 (citing Lammers, 479 S.W.3d at 632; Dorsey, 113 S.W.3d at 317); see also Smith, 456 S.W.3d at 852 (finding the trial court did not err in refusing to submit a self-defense instruction where the record showed the defendant did not have a reasonable belief that deadly force was necessary under facts showing the victim threatened to fight, yelled at, and came within inches of the defendant, who even backed away and declined to fight, but never hit the defendant or displayed a weapon before the defendant opened fire on him). Here, we review the evidence in the light favorable to conviction, neither reweighing the evidence nor deciding the credibility of witnesses. See Clark, 486 S.W.3d at 490 (quoting Henderson, 311. S.W.3d at 413). Sinks admitted Victim did not lay a hand on him and that he never saw Victim had a gun. Sinks announced that he had a CCW, and a factfinder reasonably could infer that Victim was only responding to Sinks's escalation when he said that he did, too.

As further support for his claim of self-defense, Sinks testified that when he saw Victim reaching behind himself, he believed Victim was going for a gun. It was this act that Sinks explains put him in fear for his life, forcing him to respond in an instant. We note that Sinks's own testimony offers an alternative inference supporting the verdict. The record shows that

25

`

Sinks consistently told police officers and testified at trial that when he arrived at the Hardee's and saw Victim inside the restaurant, he went back to his car to get his gun—a gun he borrowed from a friend for the express purpose of defending himself against Victim, whom he had repeatedly threatened along with K.T.S.—because he believed Victim was carrying a concealed gun. A reasonable factfinder could accept Sinks's testimony that he assumed Victim was armed with a gun when Sinks went to his car to retrieve his gun, and disbelieve Sinks's testimony that he only thought Victim had a gun *after* Victim responded to Sinks's statement that he had a CCW. A factfinder reasonably could determine that Victim's response did not change the stakes of the encounter as Sinks maintains on appeal, and further, did not establish a reasonable belief that a use of unlawful force by Victim suddenly became imminent due to Victim's actions. See Clinch, 335 S.W.3d at 586–87 (citing Thomas, 161 S.W.3d at 379) (requiring that the person claiming self-defense must reasonably believe that death, serious physical injury, or a forcible felony is actually occurring or is imminent).

We also note that the record contains sufficient evidence from which the trier of fact reasonably could infer that Victim's reaching around his back did not suggest an imminent threat of unlawful force to Sinks. See id. Specifically, Officer Hawkins testified that the security video showed that Victim had moved his hands around his pockets and waistline of his pants *multiple times during his confrontation with Sinks*. See Dodd, 637 S.W.3d at 668 (internal quotation omitted) (noting the testimony of a single witness is sufficient to support a conviction). The trier of fact reasonably could find that, even though Sinks testified he believed Victim was carrying a concealed weapon when Sinks went back to the car to get his own gun, Sinks did not react with deadly force or in any aggressive manner when Victim had reached to pull up his pants earlier in the encounter. From this evidence, as the State suggests, a factfinder logically could infer that

26

Sinks did not have a reasonable belief that he was threatened with the imminent use of unlawful force when Victim reached around the back of his pants at the moment Sinks shot him. See id.; Clinch, 335 S.W.3d at 586–87 (citing Thomas, 161 S.W.3d at 379); see also Williams, 608 S.W.3d at 209 (citing Stewart, 560 S.W.3d at 533); Jones, 553 S.W.3d at 913 (internal quotation omitted); Henderson, 311 S.W.3d at 413 (internal quotation omitted).

We recognize that Sinks had no duty to retreat from the Hardee's.[4] See Section 563.031.3(3). And we further acknowledge that Sinks cooperated with police after shooting Victim, consistently telling officers that he shot Victim in self-defense. However, the record also contains facts about Sinks's conduct before, during, and after the shooting that undermine Sinks's claim of self-defense and are consistent with the trial court's finding that the shooting was not justified. See Jones, 553 at 917 (quoting Montiel, 509 S.W.3d at 809). These facts include Sinks threatening K.T.S. and Victim in text messages, such as, "I hope [Victim] doesn't push me," "I will shoot [Victim] if he tries," and "I hope he doesn't try me, because if he tries me I will shoot him." Sinks never appeared scared, and he shot Victim five times, continuing to fire his gun after Victim turned and tried to run away. Victim had at least one bullet *exit* wound in the front of his chest, allowing a reasonable inference that Sinks shot Victim ***in the back***. See

---

[4] Although the State maintains Sinks's decision to remain in the restaurant showed he failed to attempt to do all he could within his power consistent with his personal safety to avoid the danger, the State's argument largely relies on common law elements that the Supreme Court of Missouri has stated should no longer be followed in light of the legislature's revisions to the self-defense statute, which must guide our analysis. See Bruner, 541 S.W.3d at 536–37; see, e.g., State v. Demery, 568 S.W.3d 552 (Mo. App. E.D. 2019). We need not decide in this case the extent to which a defendant's decision not to retreat or otherwise avoid a confrontation, even absent a statutory duty to retreat, is relevant to the reasonableness of a defendant's belief that deadly force was justified. See, e.g., State v. Whipple, 501 S.W.3d 507, 514–15, 518–519 (holding that the legislature's elimination of the duty to retreat from one's own property did not eliminate the statute's reasonableness requirements nor the relevance of whether the defendant did everything within his power consistent with his and his family's safety to avoid the danger); Chad Flanders, *Interpreting the New "Stand Your Ground" Rule*, 73 J. MO. BAR 20, 21–22 (2017) (suggesting that a strict interpretation of the 2016 expanded "no duty to retreat" language may require omitting any consideration of a defendant's decision to remain in a confrontation but that a more moderate interpretation, consistent with the statutory language, permits considering the defendant's conduct related to retreat as relevant to assessing the reasonableness of the use of deadly force).

`

Williams, 608 S.W.3d at 210 (noting the impact of shooting a retreating individual on the reasonableness of a self-defense claim); see also Clark, 486 S.W.3d at 491 (noting in finding the the defendant's self-defense claim was unreasonable that autopsy evidence showed the victim was in a defensive position during at least part of the time he was being shot at by the defendant). Sinks emphasizes that the trial court found Sinks's belief that his use of deadly force was justified was sincerely and deeply held. However, under our hybrid legal test that places a reasonable person in the shoes of the defendant, including knowledge relevant to the defendant's state of mind, our ultimate inquiry when evaluating the circumstances and conduct at issue is "an objective test that measures conduct based on what a hypothetical ordinary reasonable and prudent person would have believed and how they would have reacted." Hendrix, 369 S.W.3d at 98 (internal quotation omitted); see also Bruner, 541 S.W.3d at 536 (quoting Smith, 456 S.W.3d at 852) (noting a reasonable belief is based on circumstantial grounds that could lead a reasonable person in the same situation to the same belief); see also State v. Thomas, 625 S.W.2d 115, 123 (Mo. 1981) ("It is not the defendant's subjective belief, however, that determines whether a self-defense instruction is required; rather, the facts must reveal that . . . [the] defendant reasonably believed that force was the ***only means*** by which he could protect himself[.]") (emphasis added). We empathize with Sinks's texted statement that "[t]his is a dangerous world we live in and defense against violence is a topic on everyone's mind." However, through text messages and testimony, Sinks repeatedly communicated his belief, and perhaps his desire and plan, that he would practice and use a claim of self-defense offensively against Victim. A trier of fact reasonably could construe these statements as an effort by Sinks to justify and disguise the premeditated murder of the man who was marrying his Ex-Wife and taking his son away from his home in Cape Girardeau. Although the trial court stated that Sinks

28

`

sincerely believed he shot Victim in self-defense, the trial court went on to conclude that Sinks's belief was unreasonable and misinterpreted the law.

Acquittal is only proper where the evidence of self-defense is "undisputed and uncontradicted." Clark, 486 S.W.3d at 492 (quoting Henderson, 311 S.W.3d at 414). "Where there is conflicting evidence or when different inferences can reasonably be drawn from the evidence, whether the defendant acted in self-defense is a question for the trier of fact." Id. (quoting Henderson, 311 S.W.3d at 414). In a bench trial, the trial court is the proper factfinder and determines if the circumstances justify self-defense, and here, the trial court found that they did not. See id. (quoting Henderson, 311 S.W.3d at 414). The evidence in the record, viewed in the light favorable to conviction, sufficiently supports a finding that Sinks did not shoot Victim in self-defense. We cannot say that a reasonable factfinder could not have reached the verdict rendered in this case. We therefore must affirm the trial court's denial of Sinks's motion for acquittal. See Williams, 608 S.W.3d at 209 (quoting Stewart, 560 S.W.3d at 533); Jones, 553 S.W.3d at 917. Point Two is denied.

## II.     Point One—The Trial Court Did Not Misstate the Self-Defense Law

In Point One, Sinks asserts the trial court erred in misapplying Section 563.031. As in Point Two, Sinks raises numerous grounds for the misapplication of the law to the facts, including alleging the facts show Sinks was not the initial aggressor, Sinks had no duty to retreat, and Sinks reasonably believed his use of force was necessary. We addressed these claims in our foregoing discussion in Point Two on the sufficiency of the State's evidence that Sinks did not shoot Victim in self-defense. Here, we address Sinks's claim that the trial court misinterpreted the law in making the following observation during sentencing:

> When [Victim] reached around behind his back to hitch up his shorts, you had an obligation to wait and see if he had a gun before you shot him, but you didn't. [Victim] was unarmed. He never touched you. You shot him three times as he

29

stood there. He fell and you shot him twice more as he was crawling on the floor. That is not self-defense. That is murder.

Sinks maintains that the trial court's statement that Sinks was obligated to wait and see if Victim had a gun improperly imposed a condition on Sinks's defense unrecognized by Missouri law that diminished the State's burden of proof.

A.      Standard of Review

Where the alleged error of the trial court is a question of law, we "review[] the ruling to determine whether the trial court misinterpreted or misapplied the law." State v. McMillon, 644 S.W.3d 281, 285 (Mo. App. W.D. 2022) (internal quotation omitted). We conduct de novo review for questions of law, including statutory interpretation. Hunter, 626 S.W.3d at 874 (citing Smith, 595 S.W.3d at 145). We will affirm the trial court's judgment on any sustainable ground even if the stated reason for the ruling is incorrect. State v. Sanders, 522 S.W.3d 212, 215 (Mo. banc 2017) (internal citation omitted).

B.      Analysis[5]

In a bench trial, a trial court serves as both the factfinder and the arbiter of the law. Brown, 360 S.W.3d at 922 (internal quotation omitted). "Trial judges are presumed to know the law and to apply it in making their decisions." State v. Finley, 403 S.W.3d 625, 629 (Mo. App. S.D. 2012) (internal citation omitted). Here, the record does not support Sinks's claim that the trial court misinterpreted and misapplied Missouri's self-defense law. See State v. Bland, 757 S.W.2d 242, 246 (Mo. App. W.D. 1988) (finding the record did not support the defendant's

---

[5] The State suggests Point One was not preserved for appellate review because Sinks did not object to the trial court's statement when it was made during sentencing. However, we find the main thrust of Sinks's argument is not that there was an error at sentencing to which he needed to object, but that the statement reaffirmed the trial court's alleged misinterpretation of the law when it rendered the guilty verdict. Sinks advocated his interpretation of the law before the trial court during the bench trial and was not required to renew the claim in a motion for new trial. See Mo. R. Crim. P. 29.11(e) (providing that in a bench-tried case, a defendant need not renew properly raised claims of error in a motion for new trial). We therefore decline the State's request to dismiss the point.

claim that the trial court misinterpreted the sentencing statute). Examining the broader context surrounding the statements at issue, the trial court properly explained the law both during the rendering of the verdict and at sentencing. We reject Sinks's argument that the challenged statement made at the sentencing hearing somehow reflected that the trial court was imposing a new obligation on all defendants claiming self-defense, i.e., one cannot shoot until he or she actually sees the aggressor's weapon. Rather, the record clearly shows that the trial court offered an observation based on the particular facts of Sinks's case, focusing on what was lacking in Sinks's defense of justification as to the reasonableness of his actions. When speaking to the investigative officer about the shooting, Sinks told Det. Franks that Victim said he too had a CCW after Sinks said he had a CCW, but Sinks also stated that he never saw Victim had a gun, Victim never stated he had a gun, Victim never said he was going to kill Sinks, and Victim was never close enough to put his hands on Sinks. The trial court's interpretation of the law referenced these facts when it concluded the State presented sufficient evidence that Sinks's use of deadly force against Victim was not reasonable. The trial court's sentencing statement also referenced Sinks's conduct during and immediately after the shooting, noting Sinks continued shooting as Victim attempted to retreat. See Williams, 608 S.W.3d at 210; Clark, 486 S.W.3d at 491. Thus, we are not persuaded that the trial court misstated or misinterpreted the statutory standard of justification as applied to the facts of Sinks's case. See Clark, 486 S.W.3d at 490, 492 (finding the defendant's reliance on a collection of statements the trial court made, including a comment that the facts immediately preceding the shooting were "fuzzy," did not demonstrate the trial court erred in finding that the defendant had not acted in self-defense where the trial court was clear on the facts of the shooting and could reasonably find that the defendant did not act in self-defense).

31

`

Further, even had the trial court misstated the self-defense law during sentencing, our finding in Point Two that the State sufficiently proved Sinks did not shoot Victim in self-defense demonstrates the trial court correctly applied the law in finding Sinks guilty of the charged offenses. See Sanders, 522 S.W.3d at 215 (internal citation omitted); State v. Brown, 500 S.W.3d 864, 866 (Mo. App. S.D. 2016) (finding no reversible error from the trial court's misstatement of law at the end of the bench trial given the correct final judgment). Because the trial court reached the right result, any alleged misstatement of the law would be harmless, and we would not hold that Sinks established substantial grounds for reversible error. See Sanders, 522 S.W.3d at 215 (internal citation omitted). Point One is denied.

## III. Point Three—The Trial Court Did Not Abuse Its Discretion in Excluding Evidence of Victim's Remote Prior Act

Point Three alleges the trial court abused its discretion in excluding Sinks's testimony following his offer of proof that he saw Victim severely beat a person fifteen years earlier. Sinks argues such evidence was relevant to Sinks's defense of justification. Further, Sinks asserts its probative value substantially outweighed any prejudice to the State and its exclusion prejudiced his defense.

### A. Standard of Review

A trial court has broad discretion in admitting and excluding evidence at trial, "and error will be found only for a clear abuse of this discretion." State v. Brandolese, 601 S.W.3d 519, 533 (Mo. banc 2020) (internal citation omitted). A trial court's evidentiary ruling is an abuse of the trial court's discretion when it is "clearly against the logic and circumstances then before the [trial] court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration[.]" Id. (internal quotation omitted). We note that "if reasonable

32

`

persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Id. (quotation omitted).

Further, we review evidentiary rulings "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." Id. at 533–34 (internal quotation omitted). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." Id. (internal quotation omitted). "In assessing whether the exclusion of evidence was harmless beyond a reasonable doubt, the facts and circumstances of the particular case must be examined, including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." State v. Watt, 531 S.W.3d 540, 550 (Mo. App. W.D. 2017) (internal quotation omitted).

B.    Analysis

"Although there is 'broad latitude under the [U.S.] Constitution to establish rules excluding evidence from criminal trials[,]' that latitude is limited by the defendant's constitutional rights to 'a meaningful opportunity to present a complete defense[.]'" State v. Nash, 339 S.W.3d 500, 513 (Mo. banc 2011) (quoting Holmes v. South Carolina, 547 U.S. 319, 324 (2006)). When a defendant raises a defense of justification, evidence of the defendant's knowledge, at the time of the incident, about the victim's specific acts of violence may be relevant to assessing the reasonableness of the defendant's self-defense claim. See State v. Whitaker, 636 S.W.3d 569, 576 n.3 (Mo. banc 2022) (noting when remanding on other grounds that the trial court did not abuse its discretion in excluding a copy of the victim's 1991 battery conviction in a 2013 homicide case where the defendant sought to use the evidence to corroborate his own knowledge of the conviction because the evidence was not probative of the

33

defendant's knowledge or mental state at the time of the offense); State v. Gonzales, 153 S.W.3d 311, 314 (Mo. banc 2005). However, "[a] trial court is not required to admit all evidence proffered about a victim's prior specific acts of violence." State v. Rutter, 93 S.W.3d 714, 731 (Mo. banc 2002) (internal citation omitted).

> **When other competent evidence has raised the question of self-defense, the trial court must exercise caution in discretionary rulings that permit a defendant to introduce evidence of a victim's prior specific acts of violence**: (1) for which the defendant has laid a proper foundation; (2) of which the defendant had specific knowledge; (3) that are reasonably related to the crime with which the defendant is charged; (4) **that are not too remote in time**; (5) that are of quality such as to be capable of contributing to the defendant's fear of the victim; and (6) that are not of quality substantially different from the act that the defendant accuses the victim of committing.

Id. (internal quotation omitted) (emphasis added).

Here, Sinks testified that he recalled that "back when we [Victim and Sinks] were friends, I saw him beat down someone before." The State objected to the testimony on grounds that the incident was too remote in time, and the trial court sustained the objection. In his offer of proof, Sinks elaborated on the prior incident, explaining that Victim brought Sinks along when Victim went to beat up a man in a parking lot approximately fifteen years ago. The victim in that incident was a football player who was over six-feet tall and over 200 pounds, and his injuries from Victim's beating were severe enough to require stitches. Sinks also testified that Victim had training as a boxer, and Sinks witnessed his fighting skills during that beating. The trial court excluded the evidence.

We find no prejudicial error in the trial court's exclusion of the prior-acts testimony. Missouri courts have held that a victim's prior acts occurring six to twelve years earlier were inadmissible for being too remote in time. See e.g., State v. Chambers, 891 S.W.2d 93, 110 (Mo. banc 1994) (finding incidents pertinent to the victim's reputation for violence that occurred six or

34

seven years before the murder were not directly known by the defendant and were too remote to be admissible); State v. Pipes, 923 S.W.2d 349, 353–54 (Mo. App. W.D. 1996) (finding incidents of the victim's prior acts, including discharging a firearm, that occurred six to twelve years before the murder were too remote and dissimilar from the present case to be admissible). Sinks testified that he had been friends with Victim for a long time before Victim began dating Ex-Wife and that they had maintained the friendship by keeping in touch once or twice per year in recent years. However, despite their long acquaintance, Sinks recalled only a single act of violence that occurred fifteen years prior and that did not involve Victim harming or threatening to harm Sinks. Compare Pipes, 923 S.W.2d at 354 (noting the prior incidents did not involve any acts of aggression or violence by the victim towards the defendant) with State v. Bowenkamp, 39 S.W.2d 753, 754 (Mo. 1931) (finding the victim's and defendant's threats against one another were not too remote in time because the record showed the threats and quarrels occurred frequently and continued up to the date of the homicide). Sinks has not supplied any judicial authority suggesting that a trial court abuses its discretion when excluding evidence of a victim's single prior act of violence against someone other than defendant occurring fifteen years prior to the charged offense in the context of self-defense. Cf. State v. Lutes, 557 S.W.3d 384, 391–93 (Mo. App. W.D. 2018) (distinguishing the admissibility of remote prior convictions for sex crimes involving minors).

Sinks addresses the issue of remoteness of the prior beating by arguing that the prior-act testimony was **necessary** to fully understand and put in context Victim's June 3 text message to Sinks in which Victim wrote, "You know what kind of man I am." Sinks reasons that his personal knowledge of Victim's prior violent behavior and the severity of the injuries resulting from Victim's fist-fighting—in conjunction with Victim's June 3 text message—was relevant to

35

`

his state of mind and fear of imminent harm. Reversible error in the exclusion of evidence, however, requires a showing of prejudice. See Brandolese, 601 S.W.3d at 533–34 (internal quotation omitted). Sinks's argument fails because the record does not show Victim's June 3 text message necessarily referenced the fifteen-year-old beating or that the June 3 text could *only* be understood in that context. See Watt, 531 S.W.3d at 550 (internal quotation omitted). Moreover, Sinks fails to demonstrate how his evidentiary claim impacted his defense of justification as argued at trial and on appeal. Specifically, Sinks's justification for shooting Victim was not premised on the reasonableness of his belief that Victim was going to severely beat and injure him in a fist fight. We acknowledge that Sinks's rejection of Victim's biddings to take it outside and fight was premised on Sinks's knowledge of Victim's fighting prowess. But Sinks testified at trial that he shot Victim because he reasonably believed Victim was reaching for a gun—not because he thought Victim was going to beat him. Sinks has argued that Victim's reaching behind his back transformed the threat of a fist fight into an imminent deadly encounter justifying Sinks's shooting of Victim. Given the explicit and distinct explanation Sinks offered at trial as to why he shot Victim, Sinks cannot demonstrate that the exclusion of evidence of Victim's prior act prejudiced his claim of self-defense. See Brandolese, 601 S.W.3d at 533–34 (internal quotation omitted).

Moreover, the evidence of Victim's prior act merely would have been cumulative to Sinks's knowledge about the physical threat posed by Victim. See id. at 536. "Cumulative evidence is additional evidence that reiterates the same point." Id. (internal quotation omitted). "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." Id. (internal quotation omitted). Here, the text messages exchanged between Sinks, Ex-Wife, and Victim in the months leading up to the shooting show

36

that Victim had recently reminded Sinks of his fighting skills, providing current evidence relevant to the reasonableness of Sinks's conduct during the confrontation at issue. See id. Further, there was no objection to Officer McCain's testimony that Sinks told him Victim was a large man and a trained boxer and that Sinks believed at the time of the confrontation at the Hardee's restaurant that he was in no shape to fight Victim. With this evidence as to Sinks's knowledge about Victim in the record before it, the trial court, as the trier of fact, found that Sinks lacked a reasonable belief that Victim was going to use imminent unlawful force against him and further found that Sinks did not shoot Victim in self-defense.

Because the proffered incident of victim's prior act occurred fifteen years before trial and was only speculatively related to Victim's June 3 statement, the trial court did not abuse its discretion in excluding the testimony as too remote in time. See id. at 533–34 (internal quotation omitted); Rutter, 93 S.W.3d at 731 (internal quotation omitted). Point Three is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
John P. Torbitzky, J., concurs.